STATE, *ex rel.* HERMAN KURZ, v. J. M. LEE, ac Comptroller.

163 So. 859.
En Banc.
Opinion Filed October 11, 1935.
Rehearing Denied November 8, 1935.

362

*Guyte P. McCord* and *LeRoy Collins,* for Relator;

*Cary D. Landis, Attorney General,* and *H. E. Carter* and *Ira A. Hutchison,* Assistants, for Respondent.

*H. C. Tillman,* for Florida Educational Association;

*Peters & Kemp* for State Association of School Board Members;

*G. L. Reeves* for Board of Public Instruction of Hillsborough County;

*Ed R. Bentley,* for Lay Committee of the Continuing Educational Council;

*Theo T. Turnbull, Claude Ogilvie, Jennings & Watts* and *Fred B. Noble,* as *Amici Curiae.*

STATEMENT.

DAVIS, J.—Prior to the adoption and ratification as a part of the State Constitution of House Joint Resolution No. 541 (page 543, General Laws, 1925 Session) proposing an amendment to Section 9 of Article XII of the Constitution of Florida relating to common school finances, this Court had impliedly held the Legislature to be without power to appropriate or distribute for school purposes any part of the general state revenues. Board of Public Instruction of Santa Rosa County v. Croom, Comptroller, 57 Fla. 347, 48 Sou. Rep. 641. In that case Chapter 5381, Acts of 1905, Laws of Florida, providing state aid to certain county schools was declared unconstitutional. The holding of the case just cited was approved and followed in Amos v. Mathews, 99 Fla. 1 (text page 114), 126 Sou. Rep. 308, 331, 347, which latter case, however, was not decided until after the amendment to Section 9 of Article XII had been proposed and ratified.

At the 1925 Session of the Legislature there was introduced and passed by the Legislature House Bill No. 920 by Mr. McCall of Hamilton County. This bill undertook to make an appropriation for, and to provide for loans from, the general revenue fund of the State for the aid of public free schools in the State (House Journal, 1926 Session, pages 1862, 1973, 2439, 2440, 2441, 2442, 2443, 3856, 3857, 3902, 4399, 4616). This bill was ultimately vetoed by the Governor after the session of the 1925 Legislature had adjourned, one of the reasons for the veto being (1925 House Journal, Extraordinary Session, pages 133, 134, 135) that the bill in question conflicted with the opinion of this Court in the case of Board of Pubilc Instruction of Santa Rosa

County v. Croom, *supra*. The Governor's veto of House Bill No. 920 (1925 Regular Session) was sustained by the Legislature at its 1925 Extraordinary Session. See pages 1214, 1215, House Journal, 1925 Extraordinary Session.

Forecasting his veto, the Governor on April 28, 1925, sent the following special message to the 1925 Legislature:

"STATE OF FLORIDA, EXECUTIVE DEPARTMENT
Tallahassee, Fla., April 28, 1925.

"MESSAGE

"SUBJECT: EDUCATION

"Honorable A. Y. Milam, Speaker,
    and Members of the House of Representatives.

"GENTLEMEN:

"There will be introduced in the House and Senate a Joint Resolution proposing an amendment to Section 9 of Article XII to the Constitution, which if agreed to by the Legislature and approved by the people at the polls will have the effect of conferring upon the Legislature the power to increase the county school fund by direct appropriation from the State Treasury. If the child in the rural districts and poorer counties of this State is to enjoy equal educational advantages with the more favored child in the cities and wealthier counties, the generous hand of the State cannot longer be withheld. It is an anomalous situation when a Legislature can appropriate *millions* for higher education and not ONE CENT for an essential common school education. No one would withhold from our institutions of higher learning funds necessary for their support. As Chairman of the State Board of Education and of the Budget Commission, I was glad to advocate a liberal appropriation for those splendid institutions which are the pride of every patriotic citizen within the Common-

wealth. I did this freely, but with the fixed conviction, however, that the time has come to do justice to the great mass of the youth of the State who will be deprived of the opportunity of sharing in these legislative appropriations. In that part of my message to the Legislature dealing with education I made the following statement:

" 'In the smaller and poorer counties sufficient revenue for operating the schools cannot be had outside of State aid at its full cash value in these counties. We shall, therefore, have to find means other than the raising of values in these counties. Education in a democracy like ours is not a local question.'

"Florida is a growing. State, but her educational facilities are lagging behind her material development. Education and good roads are *not a local concern,* but necessary to the State's fullest development. We should forget boundary lines that define counties, and know none save those that mark the political limit of Florida. 'Florida, One and Inseparable,' should be our motto in matters of legislation—particularly and especially those that affect the education of the youth of the State. I earnestly urge the submission of the proposed amendment to the electorate of this State. *I can address you on no subject more important.*

"Yours truly,
"JOHN W. MARTIN, *Governor.*"

Pursuant to the Governor's message, there was almost immediately thereafter introduced into the House of Representatives House Joint Resolution No. 541 by Mr. Waybright of Duval County (House Journal, 1925 Session, page 924), proposing an amendment to Section 9 of Article XII of the Constitution to carry out the Governor's recommendation that the Constitution should be specifically amended for the purpose of "conferring upon the Legisla-

ture the *power* to increase the County School Fund by direct appropriation from the State Treasury," as had been attempted unconstitutionally to be done by the vetoed House Bill No. 920 making such appropriation under the guise of "loans."

House Joint Resolution No. 541 so introduced pursuant to the Governor's message of April 28, 1925, was approved by the House Constitutional Amendments Committee with but one change recommended in its verbiage from that in which it had been introduced into the Legislature. So House Joint Resolution No. 541 as so framed in accordance with the recommendation of the Governor, was submitted (House Journal, 1925 Regular Session, pages 924, 942, 1712, 1784, 1785, 1786, 3132, 3494, 3495, 3898, 4116; Senate Journal, 1925 Regular Session, pages 1271, 2101, 2329, 2330, 2362, 2363, 2913, 3143) as a constitutional amendment to be voted on at the 1926 General Election. At such 1926 election it was ratified by the affirmative vote of a majority of the electors voting thereon, and so became a part of the Constitution as of that date.

As will appear by reference to the Legislative Journals, after being once amended in the House of Representatives by a committee amendment (House Journal, 1925 Session, pages 1712, 1713) said House Joint Resolution was finally submitted to the electors in the form in which it was ratified as follows:

"HOUSE JOINT RESOLUTION No. 541.

"A JOINT RESOLUTION Proposing an Amendment to Section 9 of Article XII of the Constitution of the State of Florida, Relating to Education.

"*Be It Resolved by the Legislature of the State of Florida:*

"That the following amendment to Section 9 of Article XII of the Constitution of the State of Florida relating to Education be and the same is hereby agreed to and shall

be submitted to the Electors of the State at the General Election of Representatives in 1926, for approval or rejection:

"Section 9. In addition to the tax provided for in Section 8 of this Article the County School Fund shall consist of the proportion of the interest of the State School Fund and of the one mill State tax apportioned to the county, all capitation taxes collected within the county and all appropriations by the Legislature which shall with all other County School Funds be apportioned and distributed as may be provided by law and shall be disbursed by the County Board of Public Instruction solely for the support and maintenance of public free schools. Provided, that such apportionment and distribution shall be made by general law based upon some declared principle of classification to be determined by the Legislature.

"Approved June 4, 1925."

And so it was that by the submission and ratification of the proposed amendment to Section 9 of Article XII of the State Constitution, as above set forth, the Legislature became for the first time vested with the legislative *power* to increase the County School Fund by a direct appropriation from the State Treasury. Under Section 4 of Article XII appropriations by the Legislature to the *State* School Fund (the principal of which was required to be kept inviolate) had from the start been authorized under the Constitution of 1885.

So far as can be discerned from the archives and records of the Executive Department and of the Legislature since the adoption of the Constitution of 1885, each Florida Governor who has had occasion to place an interpretation on Section 2 of Article IX and Section 30 of Article III of the Constitution, has taken the position in official utterances

that the duties imposed upon the Legislature by those provisions of the Constitution were mandatory, and that where such duties had not been adequately discharged during a regular session of the Legislature by making appropriations for the conduct of the State government for the next biennium, and making provision for raising revenue to defray the current expenses of the state for the corresponding period, that it thereupon became the duty of the Chief Executive in "taking care that the laws be faithfully executed" (as provided by Section 6, Article IV) to exercise his power under Section 2 of Article III of the Constitution to call the Legislature into Extraordinary Session for the purpose of passing and enacting into law measures calculated to effectuate the requirements of said Sections 2 of Article IX and 30 of Article III to make adequate provision by way of appropriations to pay the salaries of public officers and pay the current expenses of the State and to provide for raising revenue *sufficient* to pay the same. See: Call for Extraordinary Session of Legislature by Governor Martin on the *sine die* adjournment of the 1925 Regular Session without enacting a revenue measure or appropriation bill (Pages 4521, 4522 Journal House Representatives, 1925) ; Call of Governor Carlton for Second Extraordinary Session of Legislature in 1931 to enact appropriation bill and provide sources of Revenue to meet same (House Journal, 1931 Regular and Special Sessions, page 3 of Journal for Second Extraordinary Session) ; Call of Governor Carlton for Extraordinary Session in 1929 to enact appropriation bill and make provision for raising revenue to defray the expenses of the State Government (Journal of House of Representatives, 1929 Extra Session, page 1015).

It was held by the Supreme Court in an Advisory Opinion

to Governor Martin in 1927, that the Constitution contemplates that state expenses shall not exceed the revenues provided by law to be raised for each fiscal year to defray the current expenses of the State for the fiscal period, and that it is mandatory that Section 2 of Article IX of the Constitution, to that effect, shall be observed by each regular biennial session of the Legislature. See Advisory Opinion to the Governor, 94 Fla. 967, 114 Sou. Rep. 850. It was also observed by the Court in that opinion that while appropriations might be validly made by the Legislature dependent upon future collections of revenue already provided by law to be raised for the purpose of meeting the appropriations, that such appropriations, however, even for State expenses, would not become available until collections of revenue had been realized sufficient to warrant payment of the appropriations so made contingent thereon.

The rule has been established by the judicial decisions of the highest court in this State, that in construing a statute or constitutional provision for the purpose of ascertaining and determining its intent and purpose, and legal effect, that it is always' permissible to look at the history of the constitutional or statutory provision involved in order to detemine its proper construction, State v. Amos, 76 Fla. 26, 79 Sou. Rep. 433; Tampa & J. Ry. Co. v. Catts, 79 Fla. 235, 85 Sou. R ep. 364; Jerome H. Sheip & Co. v. Amos, 100 Fla. 863, 130 Sou. Rep. 599; Louis K. Liggett & Co. v. Amos, 104 Fla. 609, 141 Sou. Rep. 153; State, *ex rel.* Parker, v. Lee, 113 Fla. 40, 151 Sou. Rep. 491. It has likewise been held permissible to examine in the same spirit and for the same purpose the contemporaneous construction or interpretation that has been placed on a provision of the Constitution by affected officials of the State and the responsible departments of the State Government

charged with the duty of interpreting and observing it, in order to ascertain what judicial construction should be followed with regard to such provisions when they become involved in a controversy brought in the courts affecting same. State v. Butler, 70 Fla. 102, 69 Sou. Rep. 771; Sullivan v. City of Tampa, 101 Fla. 298, 134 Sou. Rep. 211.

So, it appears from the foregoing statement, by a contemporaneous and consistently adhered to construction by all departments' of the State government—Legislative, Executive and Judicial, Section 2 of Article IX and Section 30 of Article III of the State Constitution have always been read together as evidencing a definite state fiscal policy and purpose, and have been regarded as imposing an inescapable constitutional duty on each regular session of the Florida Legislature to *ascertain and set forth* in a general appropriation bill what are the current expenses of the State required to sustain its officials and agencies in well and faithfully performing their several oaths of office (Section 2, Article XVI, State Constitution) as set forth and contemplated to be carried out in accordance with the State of Florida's general system of laws relating to the performance of divers acts as state functions, and to make in such general appropriation measure adequate appropriations of money to enable the state's laws to be executed by the affected officials and agencies who thereby become entitled to employ services' of individuals and procure materials on the strength of the appropriations so made, with the right to expect that the appropriation so made will be paid *in full* to discharge the obligation contracted for, out of the revenue provisions which by Section 2 of Article IX, *supra,* the Legislature is mandatorily directed to pass sufficient provisions of law to raise during the affected biennium for each fiscal

year, and which it is presumed to have done until there has been a clear showing to the contrary.

On the other hand, the historical inception of Amended Section 9 of Article XII of the Constitution relating to appropriations of money to the county school funds of the several counties as state aid thereto, and the construction of it that has been consistently observed both before and after its ratification by the electors, has been and is that said amended section of the Constitution, even when read in connection with Section 1 of Article XII of the Constitution, imposes no mandatory duty on the Legislature to provide any direct appropriations at all to the county school funds, but simply confers on the Legislature a "power" to do so that it did not possess prior to the amendment. In short, the effect of Section 9 of Article XII, as amended in 1926, has been contemporaneously construed as enabling, but not requiring, the Legislature to make direct appropriations within its resources to the county school funds of the several counties in like manner as the Legislature was enabled, but not required, under Section 4 of Article XII of the Constitution to supplement the State School Fund (the interest only on which went to the counties) by making from time to time direct appropriations thereto.

In both Section 4 of Article XII and amended Section 9 of Article XII, the power given the Legislature to appropriate money to either the State School Fund or to the County School Fund is implied, and not direct, since the power exists solely because of the fact that "appropriations by the State" have been listed in the constituent elements of the several funds as being intended to be a part of same under the constitutional definition that has been made of such funds.

Thus, insofar as Section 9 of Article XII of the State

Constitution has been definitely amended so as to confer the implied power on the Legislature to make an appropriation of state funds raised for state purposes to what has always been historically and legally heretofore considered a purely county purpose, viz.: County school fund purpose (State, *ex rel.* Bous, v. L'Engle, 40 Fla. 392, 24 Sou. Rep. 539) that section in its amended form constitutes a distinct exception to the constitutional rule stated in Amos v. Mathews, 99 Fla. 1, 136 Sou. Rep. 308, to the effect that "our Constitution contemplates' that an exclusively state purpose must be accomplished by state taxation; an exclusively county purpose * * * by county taxation.

. Specific constitutional exceptions to the "state purpose, county purpose" doctrine of taxation are to be found in Section 1, Article IX which permits intangible taxation to be "apportioned by the Legislature" for either state or county purposes; in Section 11 of Article IX which permits inheritance and estate taxes to be appropriated to any "county, municipal or educational purpose" as the Legislature may see fit," and in Section 13 of Article IX which permits motor vehicle license (tag) taxes to be levied for such purpose (including county or school purposes) as' the "Legislature may, by law, provide," excise taxation and ad valorem property taxation, except as modified as above stated, remain within the "state purpose, county purpose" rule of the Amos v. Mathews case, *supra.* See also the special one mill tax under Section 6, Article XII, Constitution.

. The so-called "parity" provisions of Section 5 of Chapter 17247, Acts 1935, if construed as contended for by some of the counsel appearing as *amicus curiae* in this case on behalf of the beneficiaries of those provisions, represents the first attempt in Florida's legislative history whereby the

Legislature has to all practical intents and purposes, and in substantial effect, appropriated moneys to the County School Fund to be realized from other constitutional state appropriations already made (under Section 30 of Article III, Const.) They represent an attempt by the Legislature to set up a safeguard against the possible failure of some of the revenues anticipated from doubtful tax measures passed by it, which if same fail in whole or in part, may render the appropriation of the school revenues under Chapter 17247, *supra,* subject to a material diminution in amount, unless in order to offset diminution, the general state appropriations made by the general appropriation bill (Chapter 16772, Acts 1935) and other state appropriation laws passed to carry on the necessary functions of the state government can be constitutionally likewise diminished proportionately in order to release additional moneys for the county school fund appropriation equal in amount to the proportionate diminution of appropriations made to defray the current expenses of the state.

So a fundamental proposition involved in the determination of this litigation is whether or not the Legislature has any express, or necessarily implied, constitutional power as a Legislature to "provide for the liberal maintenance" of the county systems of public free schools, by means of the statutory scheme of appropriations to the County School Fund under amended Section 9 of Article XII in excess of revenues reasonably to be anticipated, and then setting up a statutory plan for recouping deficits in its revenue expectations by providing for their deduction from constitutional appropriations already duly made for the current expense of the state, by means of a deduction device.

Stated differently, can the Florida Legislature, by the simple device of deducting and simultaneously appropriat-

ing to the county school fund, a part of every lawful claim against the State for work done or materials furnished in reliance upon the State's general appropriation Act as an authorization for payment in full of same, thereby in effect impose and collect an undeterminate and fluctuating amount of tax on the face value of the State's lawful obligations to its current creditors, at the same time retaining to itself the full value of the consideration it has received?

DAVIS, J.—This is an original proceeding in mandamus brought by the relator, Herman Kurz, a teacher in the Florida State College for Women, seeking a peremptory writ from this Court to coerce the respondent, J. M. Lee, as Comptroller of the State of Florida to draw his warrant on the State Treasurer directing him to pay to relator out of the General Revenue Fund in the State Treasury, the sum of $225.00, in conformity with the 1935 General Appropriation Act (Chapter 16772, Acts 1935). The object of the proceedings is to have paid to relator an approved requisition for his already earned salary as fixed by the State Board of Control and provided by law to be disbursed to relator on the Board of Controls' approval as set forth in Sections 778-779 C. G. L., 616-617 R. G. S., as amended by Chapter 11857, Acts 1927.

The sole defense of the Comptroller to the relief sought is that while admittedly relator has been lawfully employed by the State Board of Control in the manner and pursuant to authority provided by statute, and has duly and actually rendered the professional service for which his salary, as represented by his requisition, is due to be paid to him out of the General Revenue Fund of the State as provided by law, that nevertheless the Comptroller is precluded from drawing any state warrant to pay relator the salary so earned by him by reason of the fact that the 1935 Session

of the Legislature, after having enacted its general appropriation bill (Chapter 16772, *supra*), did, by a subsequent Act undertaking to make certain appropriations for public free school purposes in the several counties, expressly so limit, modify and restrict its general appropriation statute as to impose upon the respondent Comptroller the duty of withholding relator's salary payment until such time as he should be able to determine to what extent, if any, relator's compensation should be diminished in the proportion that the common school appropriation might have to be diminished during the current fiscal year, on account of insufficient funds in the State Treasury to pay both classes of appropriations in full.

As authority for the Comptroller's refusal to comply with the commands of the alternative writ directed to him, he cites and refers to the provision of Chapter 17247, Acts 1935, Laws of Florida, particularly Section 5 thereof, and avers in his return as follows:

"(5) For return to Paragraph 5 of the alternative writ of mandamus, this respondent admits that he would have ample funds in the General Revenue Fund of the State of Florida appropriated by the Legislature by Chapter 16772, Acts of 1935, with which to pay the salary of the relator as set out in the alternative writ, but for the fact that the Legislature at its session of 1935 enacted Chapter 17247 and by Section 5 of said Act placed the appropriation carried in said Act on a parity and of equal dignity with all other appropriations made by the Legislature of the State of Florida of 1935, or prior years, except certain appropriations listed in said Section 5 as exempt from such parity, and furthermore, that the respondent is uncertain as to the amount of the appropriation under said Chapter 17247. That such appropriation will impair the General

Revenue Fund of the State to such an extent that he would not have ample funds with which to pay relator's requisition.

"(6) For further return this Respondent respectfully shows unto the Court that he has not complied with the command of the alternative writ of mandamus, and cannot do so for the following reasons:

"(a) Respondent is in doubt as to his legal duty in this respect because of the uncertainty as to the proper interpretation and construction to be placed upon Section 5 of Chapter 17247, Laws of Florida, Acts of 1935, when read in connection with Chapter 16772, Acts of 1935.

"(b) Until Chapter 16772 and Chapter 17247, Acts of 1935, are construed by the Court with particular relation to the effect of Section 5 of Chapter 17247 on Chapter 16772, this respondent does not know and cannot know what his legal duties are in respect to the matter commanded by the alternative writ of mandamus.

"(c) Until the Court construes Section 5 of Chapter 17247, with particular reference to its effect upon Chapter 16772, this Respondent does not know and cannot know what his legal duties are in respect to the administration of the funds appropriated by Chapter 16772, Acts of 1935, for salaries of officers and employees of the State and for current operating expenses of the Departments and branches of the State government as to all officers and employees of the State and all departments and branches of the State government not excepted from the application of Section 5 of Chapter 17247.

"(d) That without the construction of the Court as to just which officers and employees of the State and what departments and branches of the State government, and what funds, are affected by the parity and equal dignity

provision of Section 5 of Chapter 17247, Acts of 1935, this Respondent does not know and cannot know what his legal duties are with respect to administering Chapter 16772 and/or Chapter 17247, except as to the salaries of officers and employees of the State and as to current operating expenses of the departments and branches of the State government specifically excepted from the application of the parity and equal dignity provision as contained in Section 5 of Chapter 17247, Acts of 1935.

"(e) The duty of this respondent in respect to administering the funds appropriated by Chapter 16772 for salaries of officers and employees of the State and for current operating expenses of the departments and branches of the State government, which are not excepted from the application of the parity and equal dignity provision of Section 5 of Chapter 17247, is uncertain and as to which this respondent is in great doubt by reason of the fact that among those not excepted from the parity and equal dignity provision of Section 5 of Chapter 17247 are both constitutional and statutory State officers and State employees, whose salaries are fixed by Chapter 15859, Laws of Florida, Acts of 1935.

"(f) This respondent is further in doubt as to his duty in complying with the command of the alternative writ of mandamus because of the apparent conflict between the parity and equal dignity provision of Section 5 of Chapter 17247, Acts of 1935, annd the Advisory Opinion of this Court to the Governor of April 14, 1934, 114 Fla. 520, 154 So. 154, in which the Court, construing the provisions of Chapter 15859 which fixes the salaries of the State officers and State employees, held as follows:

" 'The restrictions of the Constitution found in Section 4 of Article IX to the effect that no money shall be drawn

from the Treasury except in pursuance of appropriations made by law must be construed in connection with the equally cogent provision of Section 3 of Article XVI to the effect that every officer shall be entitled to receive his salary monthly upon his own requisition.' "

"The quoted portion of the Court's opinion seems to this respondent to mean that State officers and State employees whose salaries are fixed by Chapter 15859 are entitled to their salaries monthly, irrespective of any other provision of law making appopriation therefor, while on the other hand the parity and equal dignity provision of Section 5 of Chapter 17247 makes the payment of the salaries of all State officers and State employees not excepted from the provisions of Section 5 of Chapter 17247, contingent upon provisions of law not contained in either Chapter 15859, Acts of 1933, or Chapter 16772, Acts of 1935.

"(g) This respondent is in doubt as to his legal duty in respect to obeying the command of the alternative writ of mandamus, because of the fact that he has been advised by the attorney for the beneficiaries under Chapter 17247 and the parity and equal dignity provision of Section 5 of said Chapter 17247, that the parity clause of Chapter 17247 puts the appropriation made in said Act on a parity with all appropriations made by the Legislatures of Florida with the exception of the appropriations expressly excepted in said Bill, and that the clause, 'All appropriations of the Legislature of 1935 and prior years,' includes the six cent gasoline tax funds. That the attorney for said beneficiaries under Chapter 17247 has put this respondent on notice that his clients will hold respondent responsible for any losses which may come to them by reason of the misinterpretation of this clause of said Chapter 17247. Such advice and warning is illustrated by letter dated August 17, 1935, ad-

dressed to the Honorable J. M. Lee, Comptroller, Talla-
hassee, Florida, and signed by H. C. Tillman, as follows:

" 'SUTTON, TILLMAN & REEVES

" 'ATTORNEYS AT LAW

" '1201-1211 Wallace S. Building

TAMPA, FLORIDA

" 'August 17th, 1935.
" 'Hon. J. M. Lee, Comptroller,
" 'Tallahassee, Florida.

" 'Dear Colonel Lee:

" 'We have been retained by the Florida Education Asso-
ciation, which is composed of the teachers of the State of
Florida for the purpose of seeing that they get the full
benefit of the 'parity' clause contained in Senate Bill No.
370, passed by the recent session of the Legislature.

" 'There is no question in my mind that this Clause in
the Bill puts that appropriation on a parity with all appro-
priations made by the Legislature of Florida, with the ex-
ception of the appropriations expressly excepted in the bill.
Representing the teachers and, despite the fact that I under-
stand the Attorney General holds a different view, I want
to put you on notice that my clients will hold you respon-
sible for any losses which may come to them by reason of
a misinterpretation of this Clause. Just as s'oon as you
have determined upon a definite ruling as to how you will
apply this "parity" clause I will appreciate a copy of your
opinion. The Legislature would not have used the term
"all appropriations of the Legislature of 1935 and prior
years" unless it intended that this appropriation should be
on a parity with what the Legislature designated.

" 'However, the responsibility is yours to make the decision, and I trust that you will bear in mind the possible loss to the teachers if you make a mistake.

" 'Respectfully yours,

" 'hct-d                    " '(Signed) H. C. TILLMAN.' "

"On the other hand, this respondent has been advised by attorneys representing State officers and State employees not excepted from the parity and equal dignity provision of Section 5 of Chapter 17247, that said parity and equal dignity provision of said Act is unconstitutional and void; and has no effect upon those State officers and State employees not excepted from the parity and equal dignity provision of Section 5 of Chapter 17247, whose salaries are fixed by Chapter 15859, Acts of 1933, and for which appropriations made in Chapter 16772, Acts of 1935.

"(7) By reason of the allegations of paragraph 6 and subparagraphs (a) to (g) thereof of this return, this respondent cannot with safety either to the State or himself comply with the command of the alternative writ of mandamus herein until his duties in respect to the matters herein shown are clearly defined by the Court, which duties as so defined by the Court will then be by this respondent cheerfully and in good conscience performed to the best of his ability and in compliance with the instructions given by the Court in construing the provisions of law herein referred to."

The refusal of the Comptroller to meet relator's demand because of the facts averred in his return would be untenable for the following reasons if there were no others:

(a) The Comptroller's return assumes, without alleging it to be so, that the Legislature has in fact failed to provide adequate means for raising sufficient revenues to meet all of the appropriations it made, or left outstanding, at the

close of its 1935 regular session. The return further assumes that because of such hypothetical deficiency, it is now necessary for the Comptroller to decline to pay relator in full the salary he has lawfully earned under a contract of employment authorized by State statute and performed according to state law, notwithstanding the fact that the contingency of insufficient funds in the general revenue funds in the State Treasury to meet and discharge both relator's claim and the County School Fund appropriation made by Chapter 17247, *supra,* has not yet definitely occurred. Indeed, for aught that appears to the contrary by any allegation in respondent's return, such contingent deficiency may never occur in fact if available resources are conservatively marshalled. So it is obvious, therefore, that should there be at all times enough money in the State Treasury to satisfy all demands against the General Revenue Fund, suggested questions of inferiority, parity, or superiority in dignity of appropriations from the State General Revenue Fund *inter sese,* that is as between appropriations for salaries and current expenses of the State, and appropriations to the County School Fund under amended Section 9 of Article XII, become wholly academic in character.

(b) On the other hand, if it be assumed as true that the Legislature of 1935 did, in fact, intend to defeat performance of the mandatory constitutional duty that was cast upon it by Section 2 of Article IX of the State Constitution "to provide for raising revenues *sufficient* to defray the current expenses of the State for each fiscal year," thereby apparently purposing by Chapter 17247, *supra,* to create a deficiency in the general revenue fund of the state through an attempted withdrawal from it of the amount of the special school appropriation provided for by said Chapter 17247, *supra,* in lieu of raising by adequate taxation addi-

tional revenues *sufficient* to pay to the county school funds of the several counties the amounts intended to be apportioned and distributed to them in accordance with the authority of Amended Section 9 of Article XII to appropriate state funds as an aid to a purely county school purpose, it is evident that in such a situation, the *state purpose* appropriations made by Chapter 16772, *supra*, "for the salaries of public officers and other current expenses of the State" as contemplated by Section 30 of Article III of .the Constitution, must, in accordance with the plain intent of the constitutional scheme of separation of the sources of state funds and county school finances, be given precedence *in payment* out of available funds in the state treasury to the credit of the general revenue fund, where the moneys on hand are definitely known to be inadequate to meet the authorized appropriations duly made "for the salaries of public officers and other current expenses of the state" should the county school fund appropriation under Chapter 17247, *supra*, be at the same time paid out of the general revenue funds on hand in the State Treasury.

Chapter 17247, Acts of 1935, which originated in the Legislature as Senate Bill No. 370, is in express terms, as disclosed by its title, an Act making an appropriation of state funds to increase the county school fund and regulating the expenditures of such fund in order to effectuate the purpose of the Legislature to *assist* each county in the State in providing for a minimum of eight months free schools in accordance with the requirements of the state law on that subject. As appears by Section 2 of the Act, the appropriation is expressly stated to be an appropriation "from the General Revenue Fund" in a sum equivalent to $800.00 for each instruction unit existing in the State of

Florida during the immediately preceding scholastic year, less certain credits specifically provided for.

Section 5 of the Act providing that "this" appropriation (meaning the appropriation made by Senate Bill No. 370) shall be on a parity of equal dignity with all other appropriations made by the Legislature of the State of Florida for 1935, or prior years, with certain exceptions of amounts appropriated by the general appropriation Act, necessarily has reference to such other appropriations as are required by their terms to be drawn out of the *general revenue fund* of the state. If this is not so, then the effect of the Act is broader than the subject expressed in its title and the provision must go down in its entirety as a violation of Section 16 of Article III of the Constitution, if for no other reason, since no notice whatsoever of an attempted revolutionary change in the whole fiscal policy of the state, such as would follow such a construction, is in any respect indicated by the title of said Senate Bill No. 370.

Section 4 of Article IX of the Constitution provides that "no money" shall be drawn from the Treasury except in pursuance of appropriations made by law." It is therefore necessary that for every appropriation there shall be statutory authority, or authority contained in the Constitution itself, for the withdrawal of the funds raised for state public purposes. Advisory Opinion to Governor, 114 Fla. 520, 154 Sou. Rep. 154.

An appropriation of money is the setting it apart officially, out of the public revenue for a special use or purpose, in such manner that the executive officers of the government will have authority to withdraw and use that money, and no more, for that object, and for no other. State, *ex rel.* Norfolk Beet-Sugar Co., v. Moore, 50 Neb. 88, 69 N. W. Rep. 373, 61 Am. St. Rep. 538; State v. Allen, 83 Fla.

214, 91 Sou. Rep. 104. The object of a constitutional provision requiring an appropriation made by law as the authority to withdraw money from the State Treasury is to prevent the expenditure of the public funds already in the Treasury, or potentially therein, from the sources provided to raise it, without the consent of the public given by their representaives in formal legislative Acts. Such a provision secures to the Legislature (except where the Constitution controls to the contrary) the exclusive power of deciding how, when and for what purpose the public funds shall be applied in carrying on the government. Lainhart v. Catts, 73 Fla. 735, 75 Sou. Rep. 47.

There is a pronounced distinction between the appropriation, or the setting aside, of a sum of money for a particular thing, and the actual disbursement of funds to meet the object of such an appropriation. Presumably, the Legislature does not undertake to make an appropriation of any funds not actually or potentially in hand. This is so since the making of an appropriation without having provided revenues from some source to meet it, or without any right to anticipate the accrual otherwise of funds in the Treasury to enable the appropriation to be discharged by an actual disbursement of funds when it is due to be paid, would be the creation of an illegal State debt which would not constitute a *current* expense of the state inasmuch as it would have to be provided for by subsequent revenue legislation. Advisory Opinion to Governor, 94 Fla. 967, 114 Sou. Rep. 50. An appropriation of the latter character would fail for want of a fund to be appropriated and therefore be void, since every authorized appropriation contemplates the actual or *potential* existence of revenues already provided by law to be raised to enable it to be paid.

Many mere appropriations are made by the Legislature

without any necessity occurring for making an actual disbursement of funds pursuant thereto.*    An appropriation, being merely a setting apart of money to meet an object designed to be paid for out of it, but which may never be actually paid, necessarily contemplates that the revenues accruing in the Treasury to enable it to be paid may be marshalled and disbursed for the discharge of some other cognate appropriation, the object of which shall require an actual disbursement of moneys to discharge it.

Insofar, therefore, as Section 5 of Chapter 17247, *supra,* provides that such "appropriation" to increase the county school funds shall be on a parity, and of equal dignity *as an appropriation,* with all other appropriations made by the Legislature (except items therein enumerated), it is simply the statement of a legal conclusion that would follow in any event absent the specific language in the Act, at least so long as the funds are in the State Treasury, or potentially certain to accrue therein from revenue sources reasonably to be anticipated, sufficient to meet the terms of Chapter 17247, *supra,* as well as the 1935 general appropriation Act (Chapter 16772), both of which are payable out of the general revenue fund.

But insofar as the Legislature by said Section 5 of Chapter 17247 may have intended to accomplish a diminution in the amounts provided to be raised and required by the Constitution to be appropriated to pay the salaries of public officers and other current expenses of the state pursuant to Section 2 of Article IX and Section 30 of Article III of the Constitution, so as to thereby subordinate in practice the actual payment of the current expenses of the State

---

*For example an emergency relief appropriation such as is made by Chapter 13630, Acts 1929, to take effect only in case of fires, floods, hurricanes and other disasters.

from the constitutional requirement of their *full* payment, to that of a mere *pro rata* payment in the same percentage as the state's contribution to the county school fund might have to be paid *pro rata* because of insufficient funds realized in the general revenue fund, said provision of Section 5 becomes a clear violation of Section 2 of Article IX and of Section 30 of Article III of the Constitution, since both of these sections impose mandatory constitutional duties on the Legislature to raise and appropriate *sufficient* moneys to defray *in full* the current expenses of the State authorized to be incurred by the state's officials.

This is not to say that the Legislature is without constitutional power to substantially reduce, or even to abolish its optional appropriations to any state office, institution or agency that may have been created by statute and provided to be carried on as a state activity for a public state purpose. Neither is this to say that the state Legislature may not by an appropriate state statute conserve its financial resources by appropriately amending any provision of law that has been enacted by it, fixing or providing for a stipulated compensation to be paid state officers or employees or authorizing expenditures to be made on the part of the same.

But it is to say, however, that so long as the general system of statutory laws of the state leaves set up, and required by such laws to be operated as a part of the state's governmental and institutional system, divers and sundry offices, employments and institutions, which are not only given the legal authority to function as the sovereign's creatures, but are required by law to be carried on by the responsible officers placed in charge thereof pursuant to an oath of office under Section 2 of Article III of the Constitution to well and faithfully perform the duties of their

offices and positions in executing the State's laws by carrying on duly designated state activities, in the course of the execution of which they are authorized by law to incur certain obligations as state expenses to be paid in due course out of appropriations made by the Legislature to pay the same, and against revenues provided by law to be raised by taxation to pay them as current expenses of the state, that the Legislature is without constitutional authority to make available for actual disbursement a permissive legislative contribution out of the general revenue fund to the county school fund, even though an appropriation for the latter purpose is constitutionally authorized by Section 9 of Article XII of the Constitution, until it has first provided for actually raising *sufficient* revenues to pay *in full* the lawfully fixed salaries of public officers and the legally established current expenses of the state, as is inescapably required by Section 2 of Article IX and by Section 30 of Article III of the Constitution.

Thus the Legislature may unquestionably abolish the State Board of Control and suspend the operation of all the institutions required by law to be maintained by it. By so doing, it may thereby relieve the State and its Legislature of the duty of hereafter providing for same in its budget of current State expenses. It may likewise, and by the same authority, abolish the State Board of Administration and transfer back to the several counties of the State the duty of raising county *ad valorem* tax revenues to pay the classes of obligations which the State Board of Administration is required by State law to regularly and systematically administer. And by that means it may release for appropriation to the county school fund, or to any other lawful object of legislative appropriation, all of the revenues that are now going to such board as a State agency.

The Legislature may likewise surrender to the United States War Department all of the military equipment, arms and munitions, which it has received from the Federal government pursuant to the Acts of Congress and Clause 16, Section 8, of Article I, of the Constitution of the United States, and incidentally relinquish the Federal appropriations it has been granted from the general government as Federal aid toward organizing, arming and disciplining its National Guard. By the same token, it may convert its military force into a simple State militia composed entirely of household citizen soldiers whose right to keep and bear arms as such is guaranteed by the Second Amendment to the Constitution of the United States, and thereby release, to be appropriated for any purpose the Legislature may decide as proper, including the common school fund, all amounts of revenue now provided to be expended in payment of military expenses required to be paid by the State toward keeping the State's part of its bargain with the United States government concerning the National Guard.

It may even go further and pass a law disbanding the Railroad Commission as well as the State Road Department, so as to turn over the use of the highways of the State to the indiscriminate use of motor carriers and others, and thereby save the necessity of expending for State purposes any of the large amounts of money customarily appropriated for these bodies as State agencies, in order that the revenues so conserved may be diverted to be used for some other purpose which the Legislature deems more worthy, such as an enlarged contribution to the county school fund.

But in each of such instances, the abolition of the affected office or agency would relieve it of its responsibility of functioning as a part of the State's governmental system.

And thereby the affected personnel would be advised from the effective date of the legislative Act that they could no longer look to the State to discharge any further financial obligations to, or incurred by, them.

However, so long as the Legislature by its general system of State laws erects, and requires to be maintained, the State Board of Control as a State agency, with the duty imposed by law on it to operate certain institutions of higher learning, and so long as it charges its public officials with the duty of serving on the State Board of Administration and making and filing a $50,000.00 bond (Section 12, Chapter 14486, Acts 1929) each for the privilege of so doing, and as a security for their performance of duty, and so long as the State receives and uses military equipment belonging to the United States and furnished to it under the law, with the obligation that it shall be safeguarded and kept and the personnel paid for looking after it pursuant to the State's compact with the Federal government in that behalf, and so long as the enlisted officers and men of said National Guard are required under compulsion of fine and imprisonment to respond to a call of duty to the hazard of their lives and limbs under a law providing that they shall be paid certain compensation for so doing, and so long as the statutes require the Railroad Commission of the State to hold quasi-judicial hearings and the State Road Department to administer the State's laws to provide highways under penalty of being removed from office by the Governor for neglect of duty in office if the laws are not faithfully executed by them, the Legislature is without constitutional authority, so long as Section 2 of Article IX and Section 30 of Article III remain a part of the Constitution, to refuse to treat these State agencies and others of like character, as parts of the State government, the current ex-

penses of which are required to be appropriated for, and revenues raised sufficient to defray their current expenses, in order that they may be able to function in accordance with the existing laws.

Beginning with the case of State v. L'Engle, 40 Fla. 392, 24 Sou. Rep. 539, decided in 1898, the primary object of operating the county public free schools and raising revenues therefor has been regarded by law as a *county* school purpose and not a primary State purpose. Thus the distinction has been consistently preserved between the financing of the county system of public free schools and the raising of revenues to finance the general State government.

The uniform system of public free schools provided for by the Legislature under the Constitution is administered in the respective counties throughout the State not as a State function but as a county school function by the use of the county school funds required by the Constitution to be established in each county from sources of revenue specifically enumerated in the Constitution, such funds to be disbursed by the County Board of Public Instruction solely for the support and maintenance of public free schools.

So, as has been pointed out in the Statement which precedes this opinion, the county school system and the State's right to participate in the financing of the same, except through appropriations to the State school fund under Section 4, Article XII (the interest of which is contemplated to be apportioned to the several counties) have been completely and absolutely separate under the Constitution of 1885. The two functions of government have remained absolutely and completely divorced from each other since the adoption of our Constitution in 1885 until the Amendment to Section 9 of Article XII was ratified at the 1926 election. And, as has been also pointed out in the State-

ment preceding this opinion, it has been the continuous and consistent construction of Article XII of the Constitution in its entirety by all departments of the State government that, except to the extent modified by Amended Section 9 of Article XII, the Constitution of this State does not per- mit the direct appropriation of State revenues for any county purpose, whether a county school purpose or not. See Amos v. Mathews, 99 Fla. 1, 126 Sou. Rep. 308, 331, 347.

The Legislature is not required, though it is impliedly au- thorized, to make appropriations to supplement the county school funds; and the Constitution does not make statutory appropriations to the county school fund a part of "the expenses of the State for each fiscal year."

The Constitution expressly commands that "the Legis- lature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year," and con- templates that if statutory appropriations are made for authorized purposes other than State functions and ex- penses, the Legislature shall provide for raising revenue sufficient to meet such appropriations in addition to the revenues commanded by the Constitution to be provided for, "sufficient to defray the expenses of the State for each fiscal year"; which necessarily excludes legislative authority to subordinate revenues raised to defray the expenses of the State for each fiscal year, to permissive appropriations made for other than State functions or State expenses."*

Amended Section 9, Article XII, provides that:

"In addition to the tax provided for in Section 8 of this

---

*For the first Legislature's construction of amended Section 9 of Article XII, Constitution, after it was ratified in 1926, see terms of Chapter 12012, Acts 1927, which first created a State fund to be paid to the public free schools of the counties.

Article, the county school fund shall consist of the proportion of the interest of the State School Fund and of the one mill State tax apportioned to the county, all capitations taxes collected within the county and all appropriations by the Legislature which shall with all other County School Funds be apportioned and distributed as may be provided by law and shall be disbursed by the County Board of Public Instruction solely for the support and maintenance of public free schools."

This amended organic section makes the county school tax levy the primary source of the County School Fund, and does not contemplate that "appropriations by the Legislature" shall be made the primary and dominant source of the County School Fund, as is purported to be done by Sections 2 and 3 of Chapter 17247, Acts of 1935. Prior to amended Section 9, legislative appropriations to the County School Fund were not permitted by the Constitution, but the quoted organic section, as amended in 1926, authorizes, though it does not require, appropriations to be made by the Legislature to supplement the other designated sources of the County School Fund. The Constitution does not make the county school fund a part of "the expenses of the State for each fiscal year," or require the Legislature to provide for raising revenue to supplement the specifically enumerated sources of the County School Fund, therefore the organic command of Section 2, Article IX, that "the Legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year" cannot be subordinated to the permissive authority given the Legislature by amended Section 9, Article XII, to make appropriations to the County School Fund "in addition to the tax provided for in Section 8" and other designated sources of the county school fund. The Constitution con-

templates that when "appropriations by the Legislature" are made to supplement the sources of the County School Fund, the Legislature *shall provide for raising revenue sufficient to meet all such appropriations, in addition to* the "revenue sufficient to defray the expenses of the State for each fiscal year" which are mandatorily required by Section 2, Article IX, to be raised.

So despite the adoption of Amended Section 9 of Article XII, *supra,* the uniform system of public free schools which the Legislature is by Section 1 of Article XII required to provide for and liberally maintain is still a county and special tax school district system of public free schools which local officers are not only entitled to operate to the exclusion of any power in the State to take that right from them, but are expressly required by the Constitution itself to operate pursuant to provisions of law establishing in each county a county and school district system for the operation of the public free schools.

Under the pleadings in this case, there is nothing shown to justify the Comptroller in withholding or refusing to pay the relator the amount of salary claimed by him which is shown to be due and owing him under the law and facts of this case. Neither does it appear that there is any obstacle to the Comptroller making such calculations and so marshalling available State revenues as they accrue in the General Revenue Fund that he will be enabled to comply with the constitutional mandate carried out in the general appropriation Act of 1935, and at the same time pay out in part, if not altogether, the special appropriation to the county school fund intended by Chapter 17247 to be made out of the General Revenue Funds of the State for the benefit of the common school fund of the several counties.

It must be presumed by this Court and by the Comp-

troller that the Legislature has laid ample taxes for raising revenues sufficient to pay all of the moneys that it has undertaken to appropriate by both the Acts above referred to considered as an aggregate appropriation. Only in the event of some actual deficit in the revenues required to meet the items of the General Appropriation Bill in preference to the appropriation made by Chapter 17247, *supra,* or in the event of some threatened deficit so immediate and imminent as to amount to the same thing, is the Comptroller authorized to withhold or refuse to pay out the items of appropriation made under either of those Acts. This is so, because an appropriation constitutes a mere authority to the State Treasurer to pay warrants that the Comptroller may draw on the State Treasury.

As we have pointed out, any attempt by the Legislature to diminish a payment of a constitutionally created obligation of the State in order to make available funds for a merely permissive county school purpose would be a violation of Section 2 of Article IX and of Section 30 of Article III of the Constitution, and any intendment of Chapter 17247, Acts of 1935, or provision of law purporting to have that effect, would, so viewed, be unenforceable and void and consequently not binding on the Comptroller.

Every appropriation of the Legislature for a State purpose, as set forth in a general appropriation Act passed by the Legislature according to Section 30 of Article III of the Constitution, creates an authority of law in the official or department to whom or for which such appropriation is made, to incur an obligation on the State's part within the terms of the appropriation made, and entitles those who render services or furnish materials to the State thereunder to be paid *in full* for the services rendered or the materials furnished. And so are payable in full claims for the pay-

ment of specific sums of money under general provisions of law providing for and requiring such sums to be paid to the person entitled out of the general revenues of the State, as the term "current expenses of the State" comprehends any claim or demand enforceable by mandamus against the State's general revenue fund by reason of a legislative Act of appropriation therefor, general or special. This is clearly contemplated by Section 2, Article IX, of the Constitution.

Therefore, when the State authorized by law the State Board of Control to employ Professor Kurz, the relator in this case, to render professional services to a State institution that has been lawfully set up to be operated as a part of the State's institutional system, the contract of employment so made with relator under authority of law, and contemplating a payment for services rendered within the limits of the funds appropriated to pay him under the general appropriation Act, conferred on relator a vested contractual right to receive from the State of Florida's treasury that sum of money which the general appropriation Act required to be set apart to be used for the purpose of discharging the State's obligation to him when it fell due. It follows, then, that any statutory scheme for diminution of the appropriation made by the General Appropriation Act to pay relator for the service he has already rendered under a valid contract to pay him in full the amount for which he agreed to serve, merely because the secondary appropriation to the county school fund under amended Section 9 of Article XII may be made unavailable to be paid in full if relator should be paid in full, amounts to nothing more than the indirect taking and appropriation without due process of law, of an indeterminate percentage of relator's earned salary in order to correct a deficiency in the Legislature's

intended beneficence to the county school fund, for which deficiency relator is in no wise responsible.

Courts are required to adjudicate asserted legal rights according to law and their considered judgment with reference thereto, not in capitulation to their desires or sense of emotion, nor as may appear to be expedient for the particular occasion. And in dealing with finance and taxation measures passed by the Legislature, the courts are impelled to look to the substance of a legislative scheme in its practical operation and effect, rather than to the mere form in which it has been contrived and enacted. City of DeLand v. Florida Public Service Co., 119 Fla. 804, 161 Sou. Rep. 735 (2nd headnote).

Viewing the substance rather than the form of the legislative scheme here involved, it is obvious that in its practical effect the Legislature has attempted to indirectly tax (or take from) every claimant who has performed service, or furnished materials to the State on the strength of the State's promise to pay *in full* therefor as implied in its General Appropriation Act, whatever of the amount he has become entitled to receive from the State for his services so rendered or materials furnished that the State disbursement officials may find necessary to exact from him as a deduction from the amount he has earned, in order to make up for a deficit in avails from other taxation revenues anticipated by the Legislature to be collected but failing of realization in accordance with its frustrated expectations.

A direct income tax (which is prohibited by Section 11 of Article IX of the Constitution) if levied at the discretion of the Comptroller in an indeterminate amount on every salary and on the face value of every material contract with the State after it has been performed, would lead to no different practical result, insofar as its effects on the preju-

diced party is concerned, than the enforcement of Section 5 of Chapter 17247 in a manner practically operating to accomplish the same thing as herein contended for. To merely analyze the practical workings of such a scheme is to establish at once its inherent invalidity should the statute be so construed as to mean what has herein been urged in argument by some of the parties in interest.

In connection with what has just been said, it is to be observed, also, that the statutory scheme in question neither contemplates nor provides for any advance determination of what, if any, amount a particular claim for work done or materials furnished after it is done or furnished, may have to be reduced in the course of administration of the law by the State's disbursing officers in order to carry out the statute's diminution plan of *pro rata* satisfaction. The amount of each *pro rata* payment to be allowed, must necessarily fluctuate under such a plan from day to day, being as it is always dependent upon the active financial condition of the State Treasury for the time being.

Thus construed the statutory plan contended for may operate to take without compensation from every contractor who may furnish at a stipulated price per ton one hundred tons of coal to the State Board of Control, the value of forty of the tons furnished. This the statute would certainly bring about in the event that it should be found necessary to do that in order to carry out the "parity" of payment scheme to the county school fund, as it has been argued here that the Legislature intended it to operate.

With similar evil consequences, such plan will take from Professor Kurz, the relator in this case, an indefinite and heretofore undetermined percentage (said in oral argument at the bar to amount to about forty per cent. at the present writing) of what he has already earned as his August sal-

ary of $225.00 per month, should the peremptory writ of mandamus applied for in this case be denied. It will also confiscate to the public use without compensation, the interest on, or earning value of the payable portion of relator's salary during the time the State's officers would be compelled to withhold it after it is admittedly due, in order to make up the elaborate calculations that are obviously indispensable to the end that such warrant plan of payment may become capable of administration by the Comptroller.

Questions of law that were suggested in the briefs and adverted to in the oral argument of this case, and which have not been specifically discussed and decided in this opinion, will be reserved for future determination should it become necessary that they be adjudicated in an appropriate proceeding requiring a decision of such questions.

It follows from what has been said that the return of the respondent Comptroller being insufficient in law to preclude the granting of the relief prayed, the peremptory writ of mandamus should be awarded with relator's motion filed to that end.

Peremptory writ of mandamus awarded.

WHITFIELD, C. J., and BROWN, J., and GRAY and JOHNSON, Circuit Judges, concur.

TERRELL, J., dissents in part.

ELLIS, J., absent because of illness.

BUFORD, J., disqualified.

TERRELL, J. (dissenting in part).—The Legislature of 1935 enacted Chapter 16772, better known as the General Appropriation Bill. It also enacted Chapter 17247 making an appropriation for public free schools and for other purposes, Section Five of which is as follows:

"This appropriation shall be on a parity and of equal dignity with all other appropriations made by the Legislature

of the State of Florida of 1935 or prior years, except the following appropriations as contained in House Bill No. 1256 of the Session of 1935, as follows: * * *

"If, for insufficient funds or otherwise, this appropriation cannot be paid in full during any given year, it shall be diminished only in the same proportion that other appropriations made by the Legislature and not hereinabove excepted are diminished during such given year."

On becoming effective the Comptroller declined to draw warrants for payment of the salary of those not included in the exceptions listed in Section Five but not quoted here. This is a proceeding in mandamus seeking to compel the performance of that duty. We are consequently confronted with the question of whether or not the Legislature can modify the terms of Chapter 16772 in the manner attempted by the concluding paragraph of Section Five of Chapter 17247.

The majority opinion holds Chapter 17247 invalid because in conflict with Section Two of Article Nine and Section Thirty of Article Three of the Constitution. Section Thirty of Article Three requires that laws making appropriations for the salaries of public officers and other current expenses of the State shall contain provisions on no other subject. Whatever bearing this provision has on the main question presented seems to me to be remote.

The pertinent part of Section Two of Article Nine ordains that the "Legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year."

The terms of Section Two of Article Nine as quoted are mandatory. But what constitutes the "expenses of the State for each fiscal year?" I do not agree that the biannual appropriation bill and Acts making other appropri-

ations conclude the answer to this question. In my judgment, "expenses of the State for each fiscal year" has reference to the operating expenses of those departments, commissions, boards, or bureaus set up by the Constitution for the purpose of guaranteeing to the people of Florida a democratic form of government. Those departments in other words in which some portion of the sovereignty is reposed.

Under our Constitution the support of institutions for the insane, the blind and the deaf, a State Board of Health, a State prison, State militia, and "such other benevolent institutions as the public good may require" is made mandatory. (Articles Thirteen, Fourteen, and Fifteen.) The Constitution in terms and by positive inference authorizes the Legislature to create other commissions and agencies as the public good requires and for their purpose vest them with administrative and judicial functions. (Section One of Article Five and Section Thirty-five of Article Five.) I think the operating expense of all such agencies, commissions, and institutions must be comprehended in the "expenses of the State for each fiscal year" as must contracts and obligations made by them pursuant to law.

I do not think the first part of Section Five providing that "this appropriation shall be on a parity and of equal dignity with all other appropriations made by the Legislature of the State of Florida for 1935" adds one whit to its force and effect. The fact of its passage gave it that status but insofar as Section Five attempts to modify and withdraw from the general appropriation bill an amount sufficient to neutralize any deficit that may arise from disbursing the two appropriations, as related to the governmental purposes herein named and no more, it is an unwarranted invasion of

Section Two of Article Nine of the Constitution and cannot stand.

The logic supporting this promise is that government is the first essential to a well organized society. If government does not function efficiently and expeditiously we do not have schools, roads, police protection, religious liberty, nor any of the other benefits offered by the State for the well being of the citizen. The agencies of government set up to do this should not be hampered in their processes nor restricted in their freedom to contract and execute the powers with which they are clothed. These must be definite and fixed and never subject to uncertainty or disruption.

It is not my view that every agency instituted by the Legislature for economic, sociological, or benevolent purposes meets the test prescribed here and not being so the protection of Section Two of Article Nine cannot be invoked in their behalf. I can conceive of no reason and am cited to no authority why open appropriations not tied to one of the purposes herein named cannot be subjected to the so-called Parity clause of Chapter 17247.

The Legislature has an unlimited discretion in the matter of making and restricting appropriations of public funds when not controlled by constitutional limitation. There must of course in obedience to Section Four of Article Nine of the State Constitution which was copied from the Federal Constitution, be an appropriation, but this done it can take any shape or direction the Legislature designs it. See Humbert v. Dunn, 84 Cal. 57, 24 Pac. 111, for an interesting discussion of the history of Section Four, Article Nine of the Constitution.

I do not agree with that part of the majority opinion holding that the responsibility for the public free school system rests primarily in the county.

The Constitutions of 1838 and 1865 inferentially recognized schools and seminaries as State responsibilities. (Article Ten, Constitution of 1838, and Article Ten, Constitution of 1865.)  It is not out of place to state in this connection that we had no public schools as we now know them in this State prior to the Civil War.  The responsibility for mass education, while inferentially recognized by the Constitution to be in the State, was actually borne by the private school and the academy.  The private school was the forerunner of the public free school, the latter being attended at first only by orphan and poor children whose parents could not pay tuition.  Our first public schools were free only to poor children and were sometimes called pauper schools.  County tax supported free schools had their origin in 1850, but were not well patronized, the insignificant sum of thirty-one cents per pupil being first appropriated for white children.  The academies of the early period were generally incorporated, privately owned, and were the forerunner of the high school.

The public school system as we now have it took shape under the Constitution of 1868 in which the State in terms assumed full responsibility, Section One of Article Eight being as follows:

"It is the paramount duty of the State to make ample provision for the education of all the children residing within its borders, without distinction or preference."

Section Two of the same Article made it mandatory on the Legislature to provide an uniform system of common schools and an university and for the liberal maintenance of the same.

The Constitution of 1868 created and provided for the distribution of a State and county school fund, created a State Board of Education, and the school law of 1869,

enacted pursuant to the Constitution of 1868, contained provisions to make the constitutional provisions more effective. Both the Act and the Constitution recognized the State as the major responsibility for the public school system.

The present Constitution of 1885, by Article Twelve, did nothing more than enlarge on and add to the provisions of the Constitution of 1868 on the subject of education. It increased both the county and the State school funds, provided for the creation of special tax school districts to further enlarge the county school fund, it enlarged the State Board of Education, vested it with designated powers and authorized the Legislature to clothe it with additional powers, which it has done from time to time. It did not depart from the educational policy expressed in the Constitution of 1868 in any respect.

The responsibility of the State is reserved in Section One by requiring the Legislature to provide for an uniform system of public free schools and make liberal provision for their maintenance, by the enlargement of the State Board of Education and giving it control over subordinate school officers, giving it the power to prescribe courses of study, manage and invest the State school fund, and general control over the administration of schools, school policies, and school finances in the State.

The general powers and duties of the State Board of Education as defined by Article Twelve and Section 602, Revised General Statutes of 1920, Section 755, Compiled General Laws of 1927, and the general powers and duties of the County Boards of Public Instruction as defined in Section 454, Revised General Statutes of 1920, Section 561, Compiled General Laws of 1927, cannot be read and any other conclusion reached than that the County Boards of

Public Instruction are primarily agents delegated by the Legislature to administer the school affairs of the county. They have powers delegated to them by the Legislature, but they have no constitutional status. The raising of the county school fund is primarily a county responsibility, but when it comes to questions of fundamental school policy their acts are subject to review by the State Board of Education. Undoubtedly the County Board of Public Instruction has important duties to perform, but when we think in terms of the public free school system the ultimate authority and responsibility are in the State. Examination of Acts of the Legislature affecting the public schools passed frequently since the adoption of the Constitution abundantly support this view.

Section One of Article Twelve requiring the Legislature to provide for and liberally support a system of public free schools is no less mandatory than Section Two of Article Nine requiring sufficient revenue for the expenses of the State for each fiscal year. Section Nine of Article Twelve is the only authority for the Legislature to support the public free school system so when these two provisions are read together as they must be the latter becomes more than a mere permission to the Legislature to patronize the county school fund.

The Amendment to Section Nine of Article Twelve authorizing the Legislature to make appropriations to the county school fund was submitted to the people in 1925 and adopted at the general election in 1926. At the time it was adopted over half the counties were imposing the maximum millage permitted and with that could not operate school terms but four and five months and some of them less than that. There was a general demand for longer school terms and better school facilities in all the counties.

The Governor recommended the submission of the Amendment. It was advocated on the ground that every county should have an eight months' school term, that the support of the public school was a State matter, and that if adopted the Legislature could supplement the county school fund to accomplish these purposes.

Inadequacy of the county school fund prompted Amended Section Nine of Article Twelve. It in no sense abandoned the sources of that fund already provided, but authorized the Legislature to supplement those sources by appropriations from the public treasury in order that it be enabled to perform the mandatory duty imposed on it by Section One of Article Twelve. The amount of such appropriations should not be determined by arbitrary demands, but by the needs of the various counties to carry out the public free school policy as approved by the Legislature, but when made they are of the same force and effect as appropriations made for other purposes.

But such appropriations to become effective cannot be made out of thin air. They should be predicated on a revenue producing source and the Legislature is clothed with like power to so predicate them that it is to provide the revenue required by Section Two of Article Nine. So construed the challenge that the Legislature can appropriate for every purpose under the sun but the public free school is without merit. The fact is that no command in the Constitution is more compelling than that in Section One of Article Twelve, to provide and liberally support a public school system and Section Nine affords the means to do so. It placed the public school on an equality with any other interest before the State Treasury.

The amendment to Section Nine for this purpose was perfectly consistent with the history of the educational

policy of this State. Beginning in 1893, less than ten years after the adoption of the Constitution, Article Twelve has been amended six times for no other purpose than to enlarge the public school facilities. In 1908 the people rejected proposed Amendment Sixteen to impose a tax of one mill on all taxable property in the State for the benefit of the University, the Women's College, the school for the deaf and blind, and the A. and M. College, preferring to support these institutions by direct tax. Which has been liberally done. To my mind it is absurd to contend that the public schools cannot be as liberally supported.

Not only has this been the educational policy of the State, but it has been typical of that of every State in the Union. And why should it not be? The public school is the primary means provided for mass education and I know of no object or institution entitled to consideration at the hands of the Legislature ahead of it. It was here first and from the very inception of this government there have been many who realized that an enduring democratic civilization rests on the equality of its citizenship rather than on the height or magnificence of its public buildings, the size of its garage, the width of its roads, or the lousiness of its bank balances. Ninety years is long enough to nail gold knobs on clapboard doors.

Summarizing, it is my view that Section Two of Article Nine and Section One of Article Twelve impose like mandatory duties on the Legislature, the Constitution clothes it with ample authority to respond to both commands, but in doing so distinct sources of revenue must be provided each or single sources sufficient for both. Appropriations cannot be neutralized from funds provided for either purpose, but they may be from other appropriations in the

manner stated herein, whether included or excluded under the terms of Section Five, Chapter 17247.

I have examined the other questions raised, but express no opinion as to them. Some of them present grave difficulties which may be cured by Section Six, Chapter 17247.

I agree that the peremptory writ in this case should issue.

## ON PETITION FOR REHEARING.

BROWN, J.—The petition for rehearing says that the opinion of the Court in this case holds that the maintenance of the public schools is exclusively a local or "County purpose." I do not so understand the opinion. There may be some language in the statement of the historical background of the question here involved which might create that impression, but the conclusion reached in the opinion is that the Legislature has ample permissive power to appropriate State funds, raised by State taxation, to the *county school funds* of the several counties to the limit of its ability to raise revenue for that purpose; but that it cannot exercise that power in such a way as to prevent or cripple the performance of its primary and mandatory duty, under Section 2 of Article IX of the Constitution, to pay the expenses of the State government. If the State government is broken down, the counties would go with it. If it is seriously crippled, the counties would also suffer, and could not get any substantial appropriations from it. The Constitutions of this State have long made it a primary duty of the Legislature to raise revenue and make appropriations necessary to pay the expenses of the State government; but it was not until nine years ago that the Legislature was given the power to make direct appropriations of State funds to the "County School Fund" of the respective counties of the State.

'Prior to that time, the Constitution had already provided, and still provides, two distinct funds for the common schools, one, the "State School Fund," only the interest of which can be applied to the support of the public free schools, the principal to "remain inviolate"; the other, the "County School Fund," to consist of certain specified elements. These elements embraced (1) the fund derived from the county school tax of from 3 to 10 mills, (2) the proportion of the interest on the State School Fund, (3) the proceeds of the one mill State tax apportioned to the county, and (4) all capitation taxes collected within the county.

The Legislature was expressly given the power to make State appropriations to the State School Fund, the interest on which went to the County School Funds; but it was not given the power, until the amendment of 1926, to make appropriations to the County School Fund; and the power so given was not mandatory but permissive.

So, prior to 1926, the Constitution sharply distinguished the "State School Fund" from the "County School Fund," so far as appropriations were concerned; and in this sense the County School Fund, which consisted primarily of the county-raised tax, might well have been deemed a purely local or "county purpose," to be expended wholly within the county, and to which the Legislature could make no direct State appropriations. The one mill school tax imposed by the Constitution is itself apportioned to the County School Fund.

But the constitutional amendment of 1926 added to the sources of the County School Fund, "appropriations made by the Legislature," thus by necessary implication giving the Legislature the power to make such appropriations,

and to this extent such *aid* to the county school funds became a legitimate "State purpose."

There can be no question, especially since the amendment of 1926 to Section 9 of Article XII of the Constitution, about the correctness of the principle that, to the extent above outlined, the maintenance of the County School Fund in each and every county in the State is now a *State* as well as a *County* purpose, to aid which the Legislature now has ample power to make appropriations which may be just as valid as those made for any other purpose. But prior to the amendment of 1926, the Legislature could not have made such direct appropriations to the county school funds, and by that amendment it was merely given the power, but not commanded, to make such appropriations.

So, although the County School Fund in the respective counties of the State (which still remains what the Constitution calls it, i. e., a *county* school fund), now includes "appropriations by the Legislature," the fact remains that the constitutional power of the Legislature to make such appropriations is a *permissive power,* whereas the Constitution makes it the *mandatory duty* of the Legislature to raise the necessary revenues and make the necessary appropriations to pay the expenses of the State government, not partially but fully. The Legislature cannot avoid or cripple the performance of this mandatory duty, by making the payment of appropriations made pursuant thereto, in whole or in part, conditional upon the revenues proving to be sufficient to pay in whole or in part appropriations made under a merely permissive power. The performance of a mandatory duty cannot be made subordinate to the exercise of a permissive power.

While Article XII of the Constitution, in Section 1, provides that "The Legislature shall provide a uniform system

of public free schools and shall provide for the liberal main-
tenance of the same," the succeeding sections of Article
XII give very specific directions as to just how such "liberal
maintenance" shall be provided. The Constitution pro-
vided two distinct funds, one the "State School Fund" and
the other the "County School Fund," putting the primary
burden of maintaining the County School Funds upon the
respective counties, and expressly specifying the sources
from which each of these funds should be created. It left
no room for doubt that one was a State School Fund and
the other a County School Fund. In State, *ex rel.* Bours,
v. L'Engle, 40 Fla. 392, 24 So. 539, this Court said:

"It is apparent that Article XII has devised a complete
scheme for the support and maintenance of public free
schools in the various counties of the State. A State school
fund is first provided for from specified sources, which is
to be kept inviolate, and the interest accruing thereon, and
a one mill tax, shall be apportioned among the different
counties of the State. Then a county school fund for the
support of the public free schools of the county is provided
for, and the constituent parts of this fund are specified.
In addition to the apportionment from the State funds and
the capitation taxes collected within the county, a further
county assessment is to be required of not less than three
nor more than five mills on the dollar of the taxable prop-
erty of the county, and all this is constituted a county school
fund to be disbursed by the county board of public instruc-
tion solely for the maintenance and support of public free
schools. To the extent of a direct county levy for public
school purposes, Sec. 8 is a command to make such levy,
and at the same time it contains a limitation upon the power
of the Legislature to require or authorize a levy in excess
of five mills, except as provided in the tenth section for an

additional levy of not more than three mills for district purposes. The fifth section of Ariticle IX provides that the Legislature shall authorize the several counties in the State to assess and impose taxes for county purposes, and for no other purpose, and while the support of the public schools of a county may be a county purpose, still it is entirely clear that the Constitution has differentiated county taxation for this purpose and applied a limitation thereto. When the Constitution expressly enjoins that each county shall be required to levy and collect annually for the support of public free schools a tax of not less than three nor more than five mills on the dollar of the taxable property of the county, no other proper construction is admissible than that the power to tax for such purpose is limited to the higher rate stated."

Since the above quoted opinion was written, Section 8 of Article XII was amended so as to provide that each county shall be required to assess and collect annually for the support of the public schools therein "a Tax of not less than three (3) mills and not more than ten (10) mills on the dollar on all taxable property in the same."

Likewise in 1922, Section 10 was amended so as to increase the taxing limit of school districts from three to ten mills. And at the general election in 1912, Section 17 was adopted and amended in 1924, which authorized school districts to issue bonds. The amendment to Section 9, made in 1926, has already been alluded to. Except for these amendments, the comprehensive scheme of Article XII of the Constitution remains just as it was when the Constitution was adopted fifty years ago.

We cannot see that any good purpose would be subserved by a rehearing of this case. The points mentioned in the petition have already been carefully considered by

the Court. The decision already made is firmly grounded upon the plain language of the Constitution, and no good reason for departing from it has, in our opinion, been shown. The petition should therefore be denied.

WHITFIELD, C. J., DAVIS, J., and GRAY and JOHNSON, Circuit Judges, concur.

TERRELL, J., dissents.

TERRELL, J. (dissenting).—I think petition for rehearing should be granted.

DAVIS, J. (concurring).—This suit originated as an attempt by one $225.00 a month college teacher to collect his August salary he had already earned for services rendered in the State's summer school, which is a school primarily set up and maintained for the training of teachers in the common school system of Florida in order that such teachers might continue qualified to teach and in some cases secure life certificates so to do.

Thus the Supreme Court of Florida, as a judicial tribunal, has been called upon in this case to rule (if it dared) in favor of the constitutional rights of a single college teacher, as against the claimed statutory rights of 15,000 organized voters of this State whose intent to visit political reprisals on the members of the Supreme Court, if they dared to rule against them, has been covertly, if not openly, asserted as the program of the more numerous group.

This is a government of laws and not a government of men. If the courts of the land can no longer safely undertake to pass upon legal rights presented to them for adjudication, regardless of the relative voting strength of the litigants before them, then indeed, as predicated by the great historian, Macaulay, democracy in the United States has degenerated into an "anonymous tyranny" by the political mass as a substitute for the individual tyranny of an heredi-

tary monarch, and freedom under the law and constitutional government in these United States and in this State is no longer more than a nominal form, vacillating, unstable and uncertain.

My experience as a member of the Legislature has convinced me that any compactly organized group of voters can force through the Legislature any enactment (constitutional or unconstitutional), provided it is not opposed by some organization of equal or greater numbers. This is a melancholy fact, but no governmental realist in politics will dispute its truth.

Now if the courts are to yield to like influences in arbitrarily sustaining as constitutional, legislative Acts that may have been passed in violation of the Constitution, merely because some powerfully organized political group insists that such decision be rendered, right or wrong, then the Courts may as well be abolished as independent agencies of the government, because their independence is no longer a reality and the judges who pretend to preside therein are no longer judges but sycophants, the creed of whom should be the well understood creed of all mere politicians, which is to the effect that "that political course is safest which is one of well considered inaction against any popular idea."

I am loath to believe that intimidation of the Courts has now become a part of Florida's common school educational program, or that political reprisals are to be the order of the day by those educators whom the people have entrusted to educate their children in the principle of respect for constituted authority in the State as represented in its Courts, as well as to train them in ordinary educational subjects.

However, if such be the fact (which I do not believe is so), I prefer to take my stand with that conscientious Western Judge, who, when about to be hanged by a mob of

organized farmers unless he would promise not to further obey his oath of office by signing foreclosure decrees against them, chose an honorable death rather than a cowardly life of prostitution of his judicial office to other than judicial considerations.

Political "free wheeling" is bad in any department of the government. It is intolerable in a court of justice where the rights of the voter and the non-voter, the resident and the non-resident, the religious and the profane, the patriot and the anarchist, the majority and the minority, must be weighed and judged alike by the cold neutrality of an impartial Court actuated only by the maxim, *"Justitia fiat caelum ruat"* (Let justice be done though the heavens fall).

Judges must pass upon the law as they find it to have been written, not as they wish it to be. In this respect Judges perform no different qualitative function than do our worthy school teachers who must grade every examination paper turned in by their pupils as they find it to have been written, not as they would wish to have it appear.

No self-respecting school teacher would stultify his conscience and forfeit his self-respect by giving a "passing" grade to a pupil on an examination merely to avoid popular disfavor with some politically influential school patron who might agitate a taking away of his job if he did not do so. Neither can any self-respecting judge, when called on to "grade" a statute in the light of the State's Constitution, "pass" such a statute as a constitutional law when he has fully examined it and found it not to have made a "passing" grade, even though in refusing to do so, he may be politically spanked and made to stand in the corner of office-holding oblivion.

As was stated by this Court in its opinion in Maxcy, Inc., v. Mayo, 103 Fla. 552, 139 Sou. Rep. 121, text page 131:

"When appealed to in a proper case, the judiciary can render no greater service toward the perpetuation of free government than to accord to an individual litigant before it, however humble his station in society may be, the just protection of our fundamental law, when that protection is sought as a means to forestall aggressive combinations bent on employing the power of statutes to penalize the citizen for his rugged individuality in refusing to surrender his constitutional rights to what may be a contrary minded political majority. *Vox populi, vox dei,* is not the equivalent of *salus populi supreme lex esto* as recognized by the judiciary in our American system of constitutional law. * * *

I therefore concur in denial of a rehearing in this case.

Realizing the *ultra licitem* that may be implied in what I have above written and filed to be published as my concurring opinion in this case, because of the absence of any other judicial prerogative on my part to deal with the situation with which I have been personally confronted in connection with certain events and occurrences that have taken place and been brought to my attention subsequent to, but attendant upon, the announcement of the Court's original opinion which was written by me as the chosen spokesman for the Supreme Court, I may add that my declared rebuke is intended for, and is addressed to those unnamed persons only, whose conscience convicts them of being within the purview of the covert activities I have so pointedly denounced as having taken place in connection with this case after the Supreme Court's original opinion was filed and while a petition for rehearing was still pending undisposed of by this Court.

In a spirit of absolute fairness to the Florida Educational Association, and to its counsel, Senator Henry S. Tillman, who has so ably represented it before this Court in this

case, I am pleased to be officially advised through correspondence that has been addressed to me since my concurring opinion was filed, that neither the Florida Education Association, nor its able counsel, nor any of its officially accredited spokesmen, have instigated, nor taken part in, the covert activities which I have condemned as an effort, through misguided zeal for the welfare of the common schools of Florida, to commit the voting power of the organized common school supporters of this State to a program of political sabotage of the Florida judiciary in their behalf.

I accept the protestations made on behalf of the Florida Educational Association by counsel for same, as being true, and herewith record the fact of same as a supplement to what I originally stated in my special opinion in order that no one may be by me condemned who is not justly within the purview of my rebuke as determinable solely by the conviction of his own conscience.