230 So.2d 130 (1969)
STATE of Florida Upon the Relation of DADE COUNTY, a Political Subdivision of the State, Petitioner,
v.
Honorable Fred O. DICKINSON, Jr., As Comptroller of the State of Florida, Respondent.
No. 38968.
Supreme Court of Florida.
November 3, 1969.
Rehearing Denied February 2, 1970.
*131 Thomas C. Britton and Stuart Simon, Miami, for petitioner.
Larry Levy, Asst. Gen. Counsel, for respondent.
Allen Clements, Jr., Miami Beach, for intervenors.
Daniel P.S. Paul, Miami, as amicus curiae.
CARLTON, Justice.
Petitioner, Dade County, seeks a peremptory writ of mandamus in original proceedings requiring the Comptroller to approve, without further delay, its proposed 1969-1970 County budget, including its millage rate of 11.75 mills.
The proposed budget was prepared by appropriate county officials and submitted to the Comptroller for his approval in accordance with Fla. Stat. § 129.03(2) (e), F.S.A. The Comptroller took exception to the budget "for the reason that said budget appears to be in conflict with the millage limitation found in Chapter 67-395, Laws of Florida, (Sections 193.321-193.327, Florida Statutes [F.S.A.])." Under protest, the County adopted a second budget based upon a millage rate satisfactory to the Comptroller and shortly thereafter it initiated these proceedings.
The litigants have framed the point of argument thusly:
"Does Dade County, a political subdivision of the State of Florida, have the power to levy a countywide millage of up to 20 mills for the County, District and Municipal purposes it effects pursuant to Section 193.325, Florida Statutes [F.S.A.], regardless of any millages that may be separately imposed by municipalities in Dade County?"
We think it is well-settled that Dade County can provide both county-wide and municipal functions and services as provided for in its Charter and in accord with general law. Home Rule for Dade, authorized by Fla. Const. art. VIII § 11 (1885), F.S.A., is preserved under the new Constitution by art. VIII § 6(e) and (f). Further, in the recent case of State ex rel. Dade Co. v. Brautigam, 224 So.2d 688 (Fla. 1969), we declared that the County is vested with the rights and prerogatives of a regular municipality. We do not doubt, therefore, that the County may avail itself of the twenty-mill non-election aggregate limitation on county and municipal taxation as provided for under Article VII, § 9(b) of our Constitution and Chapter 67-395, Laws of Florida, 1967.
We do doubt, however, that Dade County is exempt from having to recognize that the article and chapters cited impose a twenty-mill non-election aggregate ceiling which embraces in single application both the County and the twenty-seven municipalities within it. We think it necessary at this point to discuss at length the background of the article and chapters cited in order that the reason for our judgment may be clearly understood.
*132 County and municipal governments in Florida have long been hard pressed to fund the budgets they deem necessary for meeting our phenomenal population expansion, constantly rising costs and ever growing demands for public services. Indeed this is a general governmental problem that knows no city, county or state boundaries. See, e.g., Januta, Municipal Revenue Crisis: California Problems and Possibilities, 56 Calif.L.Rev. 1525-58 (1968) and Davies, Financing Urban Functions and Services, 30 Law & Contemporary Problems, 127-61 (1965).
In the past decade, the counties and municipalities of this State have followed the national trend of relying upon the property tax as a prime resource of steady revenue. In 1967 more than 70 percent. of the total tax revenues for American cities was produced by property tax revenues. Anderson, Urban Financial Resources: Changes and Challenges, 8 Current Municipal Problems, 271-85, 272 (Feb. 1967). Florida has followed this trend primarily because of its tax structure and certain political realities. See Horwich, Florida Taxation: A State in Chains, 21 U.Miami L.Rev. 36-59 (1966).
Recently, because of our State's unparalleled growth in every area, the pressure exerted upon governmental services at all levels has become inordinate; consequently, property, as the prime source of local tax revenue, has been taxed to the limit. It is common knowledge that this process has resulted in seething resentment by taxpayers and mounting resistance to property taxation excesses not only in Florida, but throughout the nation as well. See, e.g., the article In States, Cities: A Cry for Services, a Revolt on Taxes appearing in 5 Current Municipal Problems 122-24, (May 1964). This situation has been further exacerbated by the impact of full valuation.
As Jefferson once said, "The purse is the seat of public sensibility." Accordingly, in the 1966 general elections the subject of tax relief was widely touted as the primary task facing the new post-election legislature, and many a candidate embraced the cause.
Subsequently, in July 1967 the legislature enacted two new chapters concerning taxation which were scheduled to take effect in January 1968. The first chapter, Ch. 67-395, Laws of Florida (1967) dealt primarily with county ad valorem taxation. The preamble stated that the legislature desired "to limit the overall millage that may be levied for county and district purposes to a specified millage * * *." The sections of Ch. 67-395 that follow are relevant to the disposition of this cause.
The initial section (Fla. Stat. § 193.321 (1), (2), F.S.A.) limited "aggregate ad valorem tax millage" levied by counties and districts to a maximum of ten (10) mills. In counties lacking a budget commission, the county commissioners were given power to apportion millages where necessary, "so as not to exceed the maximum millage provided herein * * *."
Section 2 (Fla. Stat. § 193.322, F.S.A.) provided that a millage rate over the ten mill limitation could be levied only upon approval by property-holders in a referendum for that purpose.
Section 4 (Fla. Stat. § 193.324(1), (2), F.S.A.) provided for a limited grace period for any county whose millage rate exceeded the ten-mill limit, but also provided that this excess could not be increased during the grace period except by vote of the property-holders. Counties undergoing total revaluation were exempted from the millage limitation until that process was completed.
Section 5 (Fla. Stat. § 193.325, F.S.A.) is of vital importance and, therefore, is given in full.
"Section 5. Nothing contained herein shall be construed to conflict with nor repeal sections 193.03 and 193.031, Florida Statutes, provided however, the provisions of section 193.031, Florida Statutes, shall not prevent an increase of millage approved in section 2 hereof. *133 Those cities or counties which now or hereafter provide both municipal and county services as authorized under sections 9, 10, 11 and 24, or similar sections hereafter adopted, of Article VIII of the Florida constitution, shall have the right to levy for county, district and municipal purposes a millage up to twenty (20) mills on the dollar of assessed valuation under this section. For each increase in the county millage above ten (10) mills which is attributable to an assumption of municipal services by a county having `home rule,' or for each increase in the municipal millage above ten (10) mills which is attributable to an assumption of county services by a city having `home rule,' there shall be a decrease in the millage levied by each and every municipality which has a service or services assumed by the county, or by the county which has a service or services assumed by the city. Such decrease shall be equal to the cost of that service or services assumed, so that an amount equal to that cost shall be eliminated from the budget of the county or city giving up the performance of such service or services." (Emphasis supplied.)
Finally, in Section 7 (Fla. Stat. § 193.327, F.S.A.) the legislature announced that it "hereby finds and determines that taxation on real and tangible personal property above the rate of two percent. (2%) or twenty (20) mills is oppressive." The legislature went on to note that oppressive millage rates existed in many areas "in which the combined millage levied against real and tangible personal property by the various taxing authorities, including boards of county commissioners, municipalities, and various other districts and boards, far exceeds" twenty mills. Finally, the legislature declared its intent to provide replacement revenues by a certain time so that ad valorem millages levied by local governments would not exceed an aggregate or total of twenty mills.
In essence this chapter was a declaration that county millage rates had exceeded the people's tolerance; further that the combined millages levied against real or tangible personal property by "the various taxing authorities, including boards of county commissioners, municipalities and various other districts and boards" would be considered oppressive if over twenty mills, unless approved by vote of the property-holders. So strong was the intent to establish a state-wide millage ceiling that the chapter specifically required an automatic readjustment in millages whenever a "home rule" city or county exceeded the 10-mill limitation by taking on any function previously rendered by the entity which surrendered the function.
Chapter 67-396, Laws of Florida (1967), the second of the two tax relief chapters, dealt with the other side of the tax coin, i.e., municipal millage limitations. The sections of this chapter are analogues of the sections in the chapter dealing with counties.
Section 1 (Fla. Stat. § 167.441, F.S.A.) commands that "No municipality shall levy ad valorem taxes for real and tangible personal property in excess of one percent (1%) of the assessed value thereof (10 mills) * * *."
Section 2 (Fla. Stat. § 167.442, F.S.A.) provides that the ten mill limitation can be exceeded only upon approval of property-holders through a referendum.
Section 3 (Fla. Stat. § 167.443, F.S.A.) is of vital importance and, therefore, is given in full.
"Section 3. In the event any municipality should lose revenue through the loss of a proprietary activity or other source of revenue, the governing body of the municipality is authorized to increase the mileage in an amount sufficient to restore such loss of revenue. In the event any municipality should relinquish any governmental function to a county or other governmental body, the governing body of such municipality shall reduce the millage in an amount which will equal *134 the cost of such governmental function." (Emphasis supplied.)
Section 4 (Fla. Stat. § 167.444, F.S.A.) provided for a limited grace period for any municipality whose millage rate exceeded the ten-mill limit, but also provided that this excess could not be increased during the grace period except by vote of the property-holders.
By the foregoing statutes, counties and municipalities are both restrained from levying ad valorem taxation in excess of ten mills singly, twenty mills jointly, except where approved by referendum of the property-holders directly affected. Limited grace periods are provided so that, where necessary, budgetary adjustments can be made in an orderly fashion; but adjustments in excess of authorized limitations must be accomplished through a referendum. The "home-rule" counties and "home-rule" cities are not exempt from these limitations. See and compare Fla. Stat. §§ 193.325 and 167.443, F.S.A. set out in full above. Note also Op.Atty.Gen. Fla. 068-87 (July 23, 1968) wherein it is stated that "the obvious legislative intent expressed in both Chapters 67-395 and 67-396, Laws of Florida, 1967" was to impose "a definite millage maximum on ad valorem taxation." (Emphasis in original.)
The proposed Constitution was under consideration when the legislature enacted the chapters discussed above. Subsequently, this same legislature adopted a joint resolution proposing the new Constitution at the special session of June 24-July 3, 1968. Contained within this new Constitution was a tax relief section, § 9(b), under the Finance and Taxation Article, Article VII, which was largely without antecedent in the 1885 Constitution. In the 1885 Constitution the only millage limitation analogous to the 1968 limitations was for school districts under Art. XII, § 8: "Each county shall be required to assess and collect annually for the support of the public free schools therein a tax of not less than three (3) mills, not more than ten (10) mills on the dollar on all taxable property in the same."
Section 9(b) is as follows:
"Ad valorem taxes, exclusive of taxes levied for the payment of bonds and taxes levied for periods not longer than two years when authorized by vote of the electors who are the owners of freeholds therein not wholly exempt from taxation, shall not be levied in excess of the following millages upon the assessed value of real estate and tangible personal property: for all county purposes, ten mills; for all municipal purposes, ten mills; for all school purposes, ten mills; and for special districts a millage authorized by law approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation. A county furnishing municipal services may, to the extent authorized by law, levy additional taxes within the limits fixed for municipal purposes." (Emphasis supplied.)
Dauer, Donovan and Kammerer offer the following valid commentary regarding this change in Should Florida Adopt the Proposed 1968 Constitution? An Analysis, Studies in Public Administration No. 31, U. of Fla. Public Administration Clearing Service, at 28:
"Section 9(b) represents a drastic departure from the present constitutional provisions governing local taxes, which set millage limitations only for school taxes. In its 1966 draft constitution the Committee on Constitutional Revision modified these limits as they apply to schools but did not go beyond this. Why then did the legislature take the drastic step of setting limits for each unit of local government? Undoubtedly, this reflects the public reaction to the sharp increases in tax bills incurred by many following assessment of their properties at full value. In many of the legislators' campaigns property tax limitation was a key issue."
The view that Section 9(b) presaged tax relief was widely expressed. In a review of the proposed constitution entitled, "A People's Constitution Will be Offered *135 to the Voters" in 42 Fla.Bar J. 1038, 1040 (1968), under the bold type internal title "Taxes Held in Check and Rights Protected" the author announced: "Ad valorem taxes shall not exceed 10 mills for all county purposes, 10 mills for all municipal purposes, and 10 mills for all school purposes." In an analysis of the proposed Constitution prepared at the request of the legislature, the Legislative Reference Bureau observed: "Millages are limited to 10 mills for all county purposes, ten mills for municipal purposes and ten mills for school purposes. Bond millages are excluded, and additional millages without limitation are permitted if approved by freeholders paying taxes. Counties providing municipal services may be authorized to levy additional taxes."
We again turn to the position asserted by the County. Simply put, the County contends that it is authorized to perform both county functions and municipal functions and is, therefore, entitled to impose a millage of up to 20 mills without qualification or restriction and regardless of any millage that might be lawfully imposed by the municipalities within the county. The County bases its claim to an unfettered twenty mills on what it considers to be the "plain meaning" of certain disembodied portions of Section 5, Ch. 67-395 (Fla. Stat. § 193.325, F.S.A.) and of Article VII, § 9(b). Precisely, the County relies upon the second sentence appearing in Section 5, supra, and the last sentence appearing in Article VII, § 9(b), supra, as the basis for its claim.
We are concerned with the impact of the county's position upon the municipal property-holding taxpayer residing in Dade County. The County argues that while a non-home-rule county is limited to a ten-mill maximum without referendum for county purposes, and while a non-home-rule municipality is similarly limited, a home-rule county can tax up to an additional ten mills without referendum within a municipality in which it is providing, under home-rule, municipal services. Reduced to its simplest terms and excluding the referendum approach, this would mean that a Dade County citizen living in a municipality is subject to a maximum of ten mills levy by the County for county services, ten mills maximum levy by the municipality for its services, and an additional ten mills maximum for municipal services provided by the County under home-rule  a total of thirty mills for county and municipal purposes (to which one can add a ten-mill maximum for school purposes for a total of forty mills; school millage, of course, is not at issue here).
We cannot reconcile the County's position with what we consider to be the expressed will of the legislature and the people, as reflected in Article VII, § 9(b) and Chapters 67-395 and 67-396, Laws of Florida (1967).
The fundamental object in construing a constitutional provision is to ascertain and give effect to the intentions of the framers and adopters, and constitutional provisions must be interpreted in such a manner as to fulfill this intention rather than to defeat it. State ex rel. West v. Gray, 74 So.2d 114 (Fla. 1954). In construing particular constitutional provisions, the object sought to be accomplished and the evils sought to be remedied should be kept in mind by the courts, and the provisions should be so interpreted as to accomplish, rather than to defeat such objects. State ex rel. West v. Gray, supra; Owens v. Fosdick, 153 Fla. 17, 13 So.2d 700 (Fla. 1943).
It is our view that both the legislature and the people intended to limit ad valorem taxation for county and municipal purposes in all areas of the State to a twenty-mill maximum beyond which millages could be raised but only if approved by referendum of the tax-paying property-holders directly affected. Regardless of any question as to the wisdom of this approach in face of expanding needs for public services, the people have *136 spoken both through the legislature and through their direct approval of Article VII, § 9(b) and their voice ought to be heard and heeded.
Home-rule governmental bodies were not exempted from this over-riding intent. The inclusion of home-rule provisions in Article VII, and in Chapters 67-395 and 67-396, were not intended as provisions for exception, but rather as a means of accommodating home-rule areas within the taxation limits. Article VII, § 9(b) states that, "A county furnishing municipal services may, to the extent authorized by law, levy additional taxes within the limits fixed for municipal purposes." (Emphasis supplied.) Note that Section 5, Ch. 67-395 (Fla. Stat. § 193.325, F.S.A.) and Section 3, Ch. 67-396 (Fla. Stat. § 167.443, F.S.A.) both require that, subject to certain conditions, when a governmental body surrenders a function to a home-rule entity, that governmental body must reduce its millage levy accordingly in order to reflect the decrease in its costs. These provisions for millage counterbalancing obviously were intended to preserve a uniform State-wide millage ceiling for all purposes.
We think that what has been said thus far amply demonstrates that the Comptroller has no clear, legal duty at this time to approve the County's tentative budget for fiscal 1969-1970. This being so, the writ heretofore issued in this Court should be discharged, and the petition for preemptory writ dismissed. We intend to do this.
However, we also recognize that discharging the writ does not resolve certain correlative problems necessarily involved in this cause. After the most careful consideration and extended study, we have concluded that these problems require comment.
We construe Fla. Const. art. VIII, § 11(1) (1885) which has been carried forward under Article VIII, § 6(e) of the current constitution, and the Home Rule Charter for Metropolitan Dade County in its present form, as granting to Metropolitan Dade County a preeminent right, superseding the right of the various Dade municipalities, to determine and set whatever millage level is necessary for the support of the county-wide municipal purposes, functions and services which the County fulfills, provides or renders under the Charter. In practical effect, this means that each municipality must share jointly with the County in the ten mill limitation on millages levied "for all municipal purposes" under Article VII, § 9(b) without referendum. Once the County has determined the necessary millage for county-wide municipal purposes, each municipality may then advance its necessary millage from that millage level onward up to the ten mill municipal ceiling without referendum. If the municipality requires a millage which, in combination with the County's millage for municipal purposes, exceeds the ten mill ceiling, then it would appear that the municipality bears the burden of the referendum.
The question then naturally arises, "How does one distinguish between county purposes and services, municipal purposes and services, and municipal purposes and services susceptible to county-wide administration by the Metropolitan Commissioners?" We have not conclusively answered this question, save on a piecemeal basis as various situations have been presented. See State ex rel. Dade County v. Brautigam, 224 So.2d 688 (Fla. 1969); Dressel v. Dade County, 219 So.2d 716 (3rd DCA Fla. 1969) which was adopted by this Court in 226 So.2d 402; City of Coral Gables v. Burgin, 143 So.2d 859 (Fla. 1962); State v. Dade County, 142 So.2d 79 (Fla. 1962); State v. Dade County, 127 So.2d 881 (Fla. 1961); State v. City of Miami, 119 So.2d 785 (Fla. 1960); City of Miami v. Keton, 115 So.2d 547 (Fla. 1959); Miami Shores Village v. Cowart, 108 So.2d 468 (Fla. 1958); Dade County v. Young Democratic Club of Dade County, 104 So.2d 636 (Fla. 1958); and Dade County v. Kelly, 99 So.2d 856 (Fla. 1957). These cases, when *137 read in conjunction with the constitutional home-rule provisions and the Charter adopted thereunder, offer uncertain guidelines for determining the exact status of interlocal governmental relations in Dade County. This uncertainty, which arises from the wording of several constitutional provisions and the Charter, presents to the taxing authorities throughout Dade County an impediment which must be removed in the interest of sound and effective government. Involved here also, of course, is the possibility  however remote  that the County could seek to preempt the total ten mills provided for "all municipal purposes," and thus force the municipalities to establish their respective millages through a public referendum.
We are of the view that the dispelling of the uncertainty which exists regarding interlocal governmental relations in Dade County is a legislative task of the most pressing urgency, the import of which transcends the boundaries of Dade, inasmuch as home-rule for several areas is preserved under Article VIII, § 6(e), and the opportunity for consolidation has been expanded state-wide under Article VIII, § 3 of the current amended Constitution. This must be done, of course, by general law.
In summation, we have held today that the constitutional limitations of ten mills for all municipal purposes, and ten mills for all county purposes, is all inclusive and embraces home-rule and consolidated governments as well as traditional counties and municipalities; that Metropolitan Dade County is the preeminent taxing sovereignty in regard to its county-wide municipal services; that the demarcation between county purposes and municipal purposes is uncertain; and that the dispelling of this uncertainty is a most urgent and pressing legislative task.
The alternative writ heretofore issued in this cause is discharged and the petition is dismissed.
It is so ordered.
ROBERTS and BOYD, JJ., concur.
DREW, J., concurs specially with opinion.
ADKINS, J., dissents with opinion.
ERVIN, C.J., dissents with opinion and concurs with ADKINS, J.
THORNAL, J., dissents with opinion.
DREW, Justice (concurring specially).
I concur in the decision prepared for the Court by Justice Carlton. In doing so, however, I must say that after all these years I am now convinced that this constant parade of expensive and seemingly endless litigation of Metro will never cease so long as the residents of Dade County insist on keeping a hydra headed form of Metro Government. Like the Hydra slain by Hercules (which had 9  not 28 heads) all heads but one must be cut off and cauterized, if the body is to survive.
ADKINS, Justice (dissenting).
In this case, we are asked to construe tax provisions of the 1968 Constitution and related transition statutes. We are asked by petitioner Dade County, in original proceedings, to issue a writ of mandamus to the Comptroller of the State of Florida, to approve the County's budget for the 1969-70 fiscal year, including a proposed millage of 11.75 mills which is the subject of this litigation.
The Board of County Commissioners of Dade County approved the 11.75-mill budget, which was an increase from the budget last year which levied 10.39 mills. Copies were sent to the respondent Comptroller, pursuant to Fla. Stat. § 129.03(2) (e), F.S.A.
The Comptroller refused to approve the 11.75-mill budget, on grounds it conflicted with the limitation in Ch. 67-395, Laws of Florida (§§ 193.321  193.327, Fla. Stat., F.S.A.). This action reversed an earlier interpretation by the Comptroller. The County adopted a temporary budget satisfactory *138 to the Comptroller, then brought this action to secure validation of its 11.75-mill budget. Respondent Comptroller cited the 1968 Constitution as well as § 193.325, in his defense.
Two closely related questions are presented:
(1) Does Dade County have present power to levy 11.75 mills county-wide for its combined county and municipal purposes, and if so, should mandamus issue to the Comptroller to approve the 11.75-mill budget?
(2) Is it premature to reach the question of tax ceilings for combined county and municipal levies; if not, what is the ceiling during this period of statutory implementation of the new Constitution?
These two questions will be separately discussed.
(1) Does Dade County have present power to levy 11.75 mills county-wide for its combined county and municipal purposes, and if so, should mandamus issue to the Comptroller to approve the 11.75-mill budget?
There appears to be no substantial disagreement among the members of this Court as to the first part of this question. Dade County does have authority to levy up to 20 mills to accomplish its combined county and municipal purposes.
It is settled law that Dade County may provide both county-wide and municipal services, as provided for in its Charter and in general state law.
Home Rule for Dade County was authorized by Fla. Const. art. VIII, § 11 (1885). Dade County voters implemented the Constitution adopting the Charter. The Home Rule provision of the 1885 Constitution is carried forward in the 1968 Constitution. Fla. Const. art. VIII, § 6(e) (1968). A new provision, Fla. Const. art. VIII, § 6 (f) (1968), states:
"To the extent not inconsistent with the powers of existing municipalities or general law, the Metropolitan Government of Dade County may exercise all the powers conferred now or hereafter by general law upon municipalities."
This Court construed the municipal powers of Dade County in State ex rel. Dade County v. Brautigam, 224 So.2d 688 (1969). We declared the County has the same right as a regular municipality to share in cigarette tax receipts distribution. The Court recognized Dade County is becoming more and more urban, and therefore requires more money to meet demands for urban-type (municipal) services.
"One of the serious limitations under the Dade County Home Rule Amendment was the inequity between the taxing powers of the county in unincorporated areas and the taxing powers of existing municipalities. The county could be called upon to provide more and more municipal type services in unincorporated areas, yet would have no more taxing power than a small rural county."
The Court then recognized in Brautigam that Dade County possesses the same power to tax as a municipality.
Dade County's power to levy up to 20 mills in ad valorem taxes, which is contested in this case, derives from Fla. Stat. § 193.325, F.S.A. (§ 5, Ch. 67-395, Laws of Florida). This is a statute enacted contemporaneous with the drafting of the 1968 Constitution, and may be considered complementary to the Constitution. The Statute provides:
"Those cities or counties which now or hereafter provide both municipal and county services * * * shall have the right to levy for county, district and municipal purposes a millage up to twenty (20) mills on the dollar * * *."
This law took effect January 1, 1968 and was carried forward under the 1968 Constitution *139 which took effect January 7, 1969 and which provided (Art. XII, § 2):
"Tax millages authorized in counties, municipalities and special districts, on the date this revision becomes effective, may be continued until reduced by law." (Emphasis supplied)
Also pertinent is Art. VII, § 9(b) of the 1968 Constitution, providing:
"(A) County furnishing municipal services may, to the extent authorized by law, levy additional taxes within the limits fixed for municipal purposes." (Emphasis supplied)
That this provision means what it says is shown by the interpretation put on it by the Legislative Reference Bureau, in an analysis prepared before adoption of the Constitution. Said the Bureau of this provision:
"Counties providing municipal services may be authorized to levy additional taxes."
An additional consideration in this case is the principle that in Dade County, the authority of Metro to provide metropolitan area municipal services supersedes the powers of the individual municipalities to singly provide these services. In Miami Shores Village v. Cowart, 108 So.2d 468 (1958), this Court upheld metropolitan traffic regulations, and said:
"The Home Rule Amendment * * * authorized the Charter to `grant full power and authority to the Board of County Commissioners of Dade County * * * to do everything necessary to carry on a central metropolitan government in Dade County.' This means the Charter could authorize the Board to regulate on a countywide basis according to a uniform plan those municipal services or functions that are susceptible to, and could most effectively [be] carried on under, a regulatory plan applicable to the entire metropolitan area  or it means nothing insofar as the authority to `carry on a central metropolitan government in Dade County' is concerned; and we must assume that every sentence of a constitution is designed to have some effect."
These cited constitutional and statutory provisions make three things plain:
(1) Counties providing municipal services are permitted to levy additional ad valorem taxes.
(2) Such authority actually and presently is given Dade County by § 193.325.
(3) The County has a pre-eminent right to carry on its metropolitan area governmental functions, including those municipal in type; the power to carry on such functions is worthless without the power to tax when needed to pay for them.
The conclusion is inescapable that Dade County now has authority to levy 11.75 mills for its budget for the fiscal year starting October 1, 1969.
This Court on September 10, 1969 issued an alternative writ to the Comptroller, commanding him to approve the 11.75-mill budget or show cause. Respondent Comptroller has neither approved the budget, nor in subsequent proceedings shown cause; he therefore should be commanded to approve the 11.75-mill budget submitted by Dade County.
(2) Is it premature to reach the question of tax ceilings for combined county and municipal levies? If not, what is the tax millage ceiling during this period of statutory implementation of the new Constitution?
Recognizing that the mandamus should issue to the Comptroller to approve the Dade County budget for reasons previously stated, it is not necessary for this Court to reach this question at this time.
However, it appears to be the wish of the majority to take up this question.
*140 Two inconsistent views are urged on this Court, in construing the pertinent statutes and constitutional provisions. The more doubtful view appears to be that combined county and municipal levies cannot exceed 20 mills.
The better view is that counties are authorized to levy up to 20 mills for combined county and municipal purposes, regardless of what tax levies individual municipalities may levy under separate authority for their own local municipal purposes.
We recognize that in the future the Legislature intends to achieve a 20-mill maximum for ad valorem taxes. However, we are persuaded that during the transition from the tax policy inherent in the 1885 Constitution, which basically separates county and municipal governments and tax administration, to the tax policy inherent in the 1968 Constitution, which seeks tax ceilings, intergovernmental cooperation and reform in tax and governmental structure, that latitude will be needed. This latitude is implied in the 1968 Constitution and expressed in the statutes.
Argument is made that § 193.325, Fla. Stat., F.S.A., substantially tracks and limits Art. VIII, § 9(b) of the 1968 Constitution, providing:
"A county furnishing municipal services may, to the extent authorized by law, levy additional taxes within the limits fixed for municipal purposes." (Emphasis supplied)
Note the first sentence of § 193.325, Fla. Stat., stating:
"Those cities or counties which now or hereafter provide both municipal and county services * * * shall have the right to levy for county, district and municipal purposes a millage up to twenty mills."
Also cited for argument is § 167.443, Fla. Stat., F.S.A. which provides that if a municipality turns over to another governmental body a governmental function, it shall reduce tax millage equivalent to the cost of the function given up. This section is not pertinent to resolution of this case, nor to a search for legislative purpose since it merely implements Art. VIII, §§ 3 and 4 (Consolidation and Transfer of Powers) which under the 1968 Constitution may be resorted to improve governmental structure and responsiveness to the popular will. Sec. 193.325 has the same purpose, since it also pertains to both cities and counties which may increase taxes if they take on additional stated functions, and (as provided in a subsequent sentence) must roll back levies if their functions are assumed (through consolidation or transfer) by another unit of government. Sec. 193.325 does, however, recognize that counties, in line with Art. VIII, § 9(b), may be authorized to levy "additional taxes" for municipal purposes served.
A careful reading of Sec. 193.325, in conjunction with other statutes and constitutional provisions, does not persuade that the only proper interpretation of these provisions is that counties and municipalities together cannot levy more than 20 mills for county and municipal purposes. To argue that the Legislature or the Constitution could not have intended to permit higher taxes in one section of Florida than another is conjecture unsupported by the record or by legislative intent as it is found in the statutes or the Constitution.
There is no question but that the 1968 Constitution contains millage limitations. It also contains provisions validating tax provisions otherwise invalid. Repeatedly, the phrase appears "as authorized by law." We are persuaded this can only mean, legislative law, not judicial legislation.
Several difficult problems must be resolved before the tax reduction objectives can be reached. For example, the machinery must be created to enforce the rollback provisions of Sec. 193.325. This is a legislative, not a judicial, task.
*141 Provision must be made to replace the revenues lost to local governments by impact of the tax provisions. The Legislature already has declared that it (not the courts) will (but not until 1970-71) find new revenues to replace those lost to local governments by the various tax provisions. Until this legislative task is done, the Court should not prematurely give effect to tax reduction goals, which must result in a dislocation of local governmental services which the Legislature itself never intended.
A third important problem to be faced, by the Legislature and not the courts, is the need for standards to ascertain the difference between county and municipal functions, since division of tax revenues will depend on such a classification when the new Constitution is fully implemented. It is not difficult to foresee a tidal wave of litigation, between cities and counties, litigating whether specific functions are "county" to be funded from the 10 mills of tax authority for "county purposes," or "municipal" to be funded from "municipal purposes" taxing power. With one county government and 27 Dade County municipalities, the courts approach without guidelines or law-making power the job of refereeing shotgun litigation. The resulting disputes between cities and county will poison the expectation of cooperation and good will which underlies Art. VIII, §§ 3 and 4 of the 1968 Constitution.
No single line of demarcation can be drawn between city and municipal purposes. In the statutes they are largely identical. Yet, other statutes, and the Constitution, speak of them as though they were as unlike as Central Florida oranges and North Florida watermelons. A demarcation line must be drawn, but this is a legislative task and should not be left to the piecemeal interpretation of the unguided courts. This Court in the past has provided few guidelines which can be followed by trial judges. Each case is left to be decided as it arises. County Commissioners of Duval County v. City of Jacksonville, 36 Fla. 196, 18 So. 339 (1895).
Recognition also has been given by this Court to the fact that the question of what may be a county or local municipal function is "a mixed question of law and fact" to be decided as the cases arise. Miami Shores Village v. Cowart, supra.
The Legislature is presumed to know the case law established by this Court. It is inconceivable that the Legislature intended to leave the great questions of timing and policy to be hammered out in scattered trial courts in an endless wave of expensive litigation. Legislative silence does not communicate intent to leave the job to the courts; it merely means the Legislature has not finished the job.
Argument is made that the intent of the Constitution or statutes is to impose an immediate ceiling of 20 mills for county and municipal purposes. This "intent" is found in the naked statement that ad valorem taxes of more than 20 mills are oppressive, followed by a clear expression of intent on the part of the Legislature to provide replacement revenues in the future (1970-71). A bare statement that a tax levy is oppressive, however true, is not raised to the level of present intention when it is followed by a plain statement of future intention.
Non constat anything in the record of these proceedings that indicates the county-municipal levy of Dade County of 11.75 mills should be reduced because of millage levies of any of the 27 municipalities within the county, or for that matter that the 1.75 mill excess over 10 mills allowed for county purposes should be reduced.
As Judges, we are not forbidden to raise our heads from our labors and look around us to see what everyone can see. We need not be blind to the fact that we *142 are in transition from one tax structure relying excessively on ad valorem taxes to one more reliant on state revenues. Nor need we be blind to the fact that the state is not yet ready, (viz: The legislative statement of intent, § 193.327, Fla. Stat., F.S.A.) to take up the burden of supporting local governments. Nor need we be blind to the fact that a restrictive decision in this case will throw the governmental machinery in Dade County into chaos. The record reveals that several hundred employees, including many police officers and firemen, will not be on duty in Dade County if the Comptroller's position prevails. We cannot believe such a result was intended by the Legislature or the framers of the Constitution or the people.
As Judges we may assume that the Legislature and framers of the Constitution intended to meet the challenges of urban growth and financial strain, equipped with something more than an uncertain commandment to reduce taxes regardless of consequences. We are aware, and may safely assume that the Legislature is aware, that highly restrictive tax limitations in other jurisdictions have produced unresponsive local government and tax inequities, and that governmental malfunctioning may occur in Florida if careful planning and implementary statutes do not precede the change from one tax system to the other. It is fallacious to assume that the rollback commandment of Sec. 193.325 controls this case, since it is designed to protect the people from abuse when changes in structure are made under Art. VIII, §§ 3 or 4, of the 1968 Constitution, and not to confuse interpretation of Art. VII, § 9(b) which pertains only to counties which meet the burgeoning demands for governmental urban-type services, beyond other than services which are merely intergovernmentally transferred.
It appears more reasonable to assume that Dade County and its municipalities are not limited to a combined total taxing power of 20 mills, although the entire issue is not clear. When conflicting views have been urged on the Court, better it would be to await legislative clarification of this matter, than to step blindly on a path that leads we know not where. Absent an unequivocal command from the Legislature, this Court should not disrupt Dade County's governmental machinery.
Dade County's power to levy up to 20 mills being established, the writ should issue. The question of a tax ceiling, however low or lofty, should be left for decision another day.
It is so ordered.
ERVIN, C.J., concurs.
ERVIN, Chief Justice (dissenting).
I concur in the opinion of Justice Adkins.
During the transition period from the old to the new constitution latitude is allowed in implementing the new millage limitations. The last sentence of Sec. 9 (b), Art. VII, Constitution of 1968, read in connection with the second sentence of F.S. Sec. 193.325, F.S.A. (Sec. 5, Ch. 67-395) permits a metro county government to levy up to 10 mills for municipal purposes in the county. Unless the municipal purposes (or services) made possible by such county municipal levy duplicate or render unnecessary a municipal service by a city municipal millage levy there is no authority in the succeeding sentences following the second sentence of Sec. 193.325 to reduce the city millage even if a maximum of 10 mills is imposed by the city. Section 2, Art. XII, Const. 1968 (the schedule) carries forward the idea that until "reduced by law" local millages authorized by Sec. 193.325 "may be continued."
*143 As Justice Adkins points out, the new Constitution does not intend that the local millage limitations therein be fully implemented until the Legislature determines that it is in order. This involves several legislative considerations; e. gs., determination of the difference between county and municipal purposes in particular situations and instances, machinery for requiring reduction of city millages where a metro county government has taken over the provision of certain municipal services within the city and replacement revenues for revenues lost to local governments because of millage limitations of the new Constitution. Compare Dressel v. Dade County (Fla.App.3rd, 1969), 219 So.2d 716, cert. denied 226 So.2d 402 and State ex rel. Dade County v. Brautigam (Fla.) 224 So.2d 688.
Non constat from anything in the record of these proceedings that indicates the county municipal levy of Dade County of 11.75 mills should be reduced because of millage levies of any of the 27 municipalities within the county or for that matter that the 1.75 mill excess over 10 mills allowed for county purposes alone should be reduced.
The peremptory writ should issue since it does not appear the Comptroller has any duty to review the metro millage in the light of the municipal millages of the cities in Dade County.
THORNAL, Justice (dissenting):
We have been officially informed that the basic question covered by the majority opinion is now moot, the parties having reconciled their current problem. I would enter an order retaining jurisdiction until the Legislature has time to act, this being basically a Legislative problem. I feel that the Court today has moved into the Legislative field instead of exercising the appropriate restraint which prohibits such action.