AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES; Daniel W. O'Connor; Kent Bell; and Beth Bowen, Plaintiffs, on behalf of themselves and others similarly situated,

v.

Glenda E. HOOD, as Secretary of State for the State of Florida; Edward C. Kast, as Director, Division of Elections; John Stafford, as Supervisor of Elections in Duval County, Florida, Defendants.

No. 3:01–CV–1275–J–21HTS.

United States District Court, M.D. Florida, Jacksonville Division.

July 25, 2003.

James Douglas Baldridge, Alan M. Wiseman, Danielle R. Oddo, Courtney O. Taylor, Vincent E. Verrocchio, Ari N. Rothman, Howrey, Simon, Arnold & White, LLP, Washington, DC, Lois G. Williams, Washington Lawyers Committee for Civil Rights & Urban Affairs, Washington, DC, for plaintiffs.

Tracey I. Arpen Jr., Scott D. Makar, Office of General Counsel, Jacksonville, FL, Charles A. Finkel, Esq., Attorney General's Office, Tallahassee, FL, for Katherine Harris, L. Clayton Roberts, Jim Smith, Edward C. Kast, Ken Detzner,Glenda E. Hood, defendants.

Tracey I. Arpen Jr., Scott D. Makar, Office of General Counsel, Jacksonville, FL, Ernst D. Mueller, Jason R. Teal, General Counsel's Office, Jacksonville, FL, for John Stafford, Warren Alvarez, Elaine Brown, Matt Carlucci, Doyle D. Carter, Gwen Chandler-Thompson, Lad Daniels, Reggie Fullwood, Alberta Hipps, Jerry Holland, King Holzendorf, Suzanne Jenkins, Pat Lockett-Felder, Jim Overton, Lake Ray, III, Faye Rustin, Lynette Self, Ginger Soud, Mary A. Southwell, Gwen Yates, defendants.

## ORDER

NIMMONS, District Judge.

Filed herein are Plaintiffs' Motion for Reconsideration (Dkt.46) and Supplemental Memorandum (Dkt.103); Defendants Hood and Kast's Response (Dkt.50) and Supplemental Memorandum (Dkt.98); and Defendants Stafford, Alvarez, Brown, Carlucci, Carter, Chandler–Thompson, Daniels, Fullwood, Hipps, Holland, Holzendorf, Jenkins, Lockett–Felder, Overton, Ray, Rustin, Self, Soud, Southwell, and Yates' Response (Dkt.51) and Supplemental Memorandum (Dkt.99).

In support of their Motion for Reconsideration, Plaintiffs assert that extrinsic evidence produced during discovery should be considered when interpreting the phrase "direct and secret" from Article VI, Section 1 of the Florida Constitution. Plaintiffs contend that this additional evidence was produced in discovery between mid-September 2002 and the end of October 2002 and that this recently produced evidence is directly at odds with the Court's October 16, 2002, Order (Dkt.42) dismissing Count II of the Complaint and requires the conclusion that the phrase "direct and secret" precludes third-party assistance except where the vote cannot be cast in another way or when such assistance is requested.

Although the Federal Rules of Civil Procedure make no mention of a motion for reconsideration, such a motion finds some support in federal practice and may in some circumstances perform a valuable function. *Above the Belt, Inc. v. Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va.1983). Reconsideration of a Court's previous order is an extraordinary remedy and, thus, is a power which should be used sparingly. *Taylor Woodrow Constr. Corp. v. Sarasota/Manatee Airport Auth.*, 814 F.Supp. 1072, 1072–73 (M.D.Fla.1993). The Eleventh Circuit has described a motion for reconsideration as

falling within the ambit of either Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for relief from judgment). *Region 8 Forest Serv. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 806 (11th Cir.1993). In either situation, relief granted from such motion is within "the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion." *Id.*

"A district court's denial of reconsideration is especially soundly exercised when the party has failed to articulate any reason for the failure to raise an issue at an earlier stage in the litigation." *Lussier v. Dugger,* 904 F.2d 661, 667 (11th Cir.1990). "A motion for reconsideration should raise new issues, not merely readdress issues litigated previously." *PaineWebber Income Properties Three Ltd. Partnership v. Mobil Oil Corp.,* 902 F.Supp. 1514, 1521 (M.D.Fla.1995). The motion must set forth facts or law of a strongly convincing nature to demonstrate to the Court the reason to reverse its prior decision. *Taylor Woodrow,* 814 F.Supp. at 1072; *Paine-Webber,* 902 F.Supp. at 1521. "When issues have been carefully considered and decisions rendered, the only reason which should commend reconsideration of that decision is a change in the factual or legal underpinning upon which the decision was based". *Taylor Woodrow,* 814 F.Supp. at 1072–73.

The motion to reconsider would be appropriate where, for example, the court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since submission of the issue to the court. Such

problems rarely arise and the motion to reconsider should be equally rare.

*Above the Belt, Inc.*, 99 F.R.D. at 101.

■ What the above case law makes clear is that a motion for reconsideration does not provide an opportunity to simply reargue an issue the Court has once determined. Court opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988). As aptly stated by the district court in *Settino v. City of Chicago*, 642 F.Supp. 755 (N.D.Ill.1986):

> Plaintiff['s] counsel betray[s] an all-too-prevalent misconception of the litigation process, in which the knocked-out combatant seeks to portray what has taken place as a mere warmup rather than as the main event.

*Id.* at 759. Unless the movant's arguments fall into the limited categories outlined in the preceding paragraph, a motion to reconsider is improper.

In the instant case, Plaintiffs rely upon what they refer to as evidence of: (1) present facts and developing law; (2) the evils sought to be prevented by Article VI, Section 1; and (3) contemporary societal needs and structure; to support their assertion that the Court erred when it held that the "direct and secret vote" provision of Article VI, Section 1 is satisfied by the assistance provided in Section 101.051, Florida Statutes.

As noted in the Court's October 16, 2002, Order, when construing a provision of the Florida Constitution that protects personal rights, a court must " 'focus primarily on factors that inhere in [the state's unique experience], such as the express language of the constitutional provision, its formative history, both preexisting and developing state law, evolving customs, traditions and attitudes within the state, [the] state's own general history, and finally any external influences that may have shaped state law.' " *Mozo v. State*, 632 So.2d 623, 630 (4th DCA 1994) (quoting *Traylor v. State*, 596 So.2d 957, 962 (Fla.1992)). The Florida Supreme Court has also stated:

> In construing a constitutional provision, the words should be given reasonable meanings according to the subject matter, but in the framework of contemporary societal needs and structure. Such light may be gained from historical precedent, from present facts, or from common sense. *State ex rel. West v. Gray*, 74 So.2d 114, p. 116 (Fla.1954). Further light may be shared by examination of the purpose the provisions was [sic] intended to accomplish or the evils sought to be prevented or remedied. *Amos v. Mathews*, 99 Fla. 1, 126 So. 308 (1930).

*In re Advisory Opinion to the Governor*, 276 So.2d 25, 29 (Fla.1973).

As evidence of "present facts and developing law," Plaintiffs rely upon (1) statements made by then Florida Secretary of State, Katherine Harris[1]; (2) a statement

---

1. Harris was quoted on-line in the St. Augustine Record as stating that " '[p]ersons who cannot see as well, read as well or understand as well still cannot count on Florida to protect their basic civil right under the Florida constitution to cast in secret their ballot.' " Dkt. 46, Exhibit B. In addition, Harris' notes for a press conference given Wednesday, January 23, 2002, provided that, "[d]espite the unprecedented reach of our reforms last year, persons who cannot see as well, read as well or understand as well still cannot count on

Florida to protect their basic civil right under the Florida constitution to cast a vote in secret, regardless of ability or disability" and that "we risk spending millions of dollars defending lawsuits based upon our failure to guarantee a fundamental right under Florida's constitution." Dkt. 83, Harris' Deposition, pp. 96–97, Exhibit 11, p. 3, 5. During Harris' deposition, she stated that nothing in her notes for the January 23, 2002, press conference was inaccurate. *See* Dkt. 83, p. 97.

made by then Director of the Florida Division of Elections and member of the Florida Secretary of State's Select Task Force on Voting Accessibility (Task Force), Clay Roberts [2]; (3) a statement to which former Senator Fred Dudley, who was hired by the Florida Department of State to head the Task Force, concurred [3]; (4) the Task Force's Final Report [4]; (5) a statement made by Task Force member Julie Shaw [5]; (6) Representative and Task Force co-Chairman Larry Crow's deposition testimony [6]; and (7) the press release of Task Force co-Chairmen Senator Richard Mitchell and Crow regarding the Task Force.[7]

As evidence of the evils sought to be prevented by Article VI, Section 1, Plaintiffs rely upon Assistant State Attorney James Kracht's testimony before the Task Force relating his experience as a blind voter attempting to use the assistance provided under Florida law. He indicated that the assistance provided to him and other visually impaired voters failed to protect their votes from outside influence.

2. Roberts stated (apparently during a Task Force meeting):

> One of the concerns I have with our current statute, ..., we have a constitutional provision that says you have a right to secret ballot, no qualifications. However, we have a statutory provision that says that if you need assistance at the poll you can get someone to help you. Go in [sic] against the constitutional provision.

Dkt. 46, Exhibit C.

3. During a Task Force hearing/meeting the following exchange occurred:

> Richard Labelle: ... it's clear that if we refer to a secret ballot that means that it is a ballot that is cast in effect independently by the voter with no one other than the voter having knowledge of the contents of that ballot.
>
> Fred Dudley: ... I think I agree with the conclusion.

Dkt. 46, Exhibit E.

4. The Task Force's Final Report was submitted to then Secretary Harris by Task Force co-chairmen, Senator Richard Mitchell and Representative Larry Crowe, and provided, in relevant part:

> The Task Force has determined that there are significant, severe, and pervasive obstacles that have been placed in the path of Florida's voters with disabilities. Although all voters, regardless of ability or disability, are guaranteed the right to cast a vote in secret by Article VI, section 1, of the Florida Constitution, voting systems and procedures in use in Florida routinely deprive voters with disabilities of this right. In the face of technology that is now available that can provide a secret ballot to nearly every voter with a disability, these inaccessible systems and procedures cannot and must not be maintained.

Dkt. 46, Exhibit F. The Task Force concluded, *inter alia*, that, absent the adoption of its recommended changes to the voting laws, Florida would fail to honor its constitutional guarantee that every citizen is entitled to have a secret, independent, and verifiable vote. *See* Dkt. 84, p. 48–49, Exhibit 7, Task Force's Final Report, p. 16.

5. The minutes of a September 10, 2001, Task Force meeting indicate that Julie Shaw stated that

> [i]t is currently an estimated 20% of people with disabilities who are LESS LIKELY to register to vote due to lack of accessibility. There are presently 33.7 million Americans with disabilities of voting age, and if all polling sites were accessible, an additional 5–10 million of these disabled would vote.

Dkt. 46, Exhibit H.

6. Crow testified that he believed that the right to vote anonymously was provided by the Florida Constitution. *See* Dkt. 84, p. 17. In addition, Crow testified that the Task Force included in its list of principles that "[v]oters with and without disabilities are equally entitled to the right of full participation in elections, including the right of casting their votes privately, independently and verifiably," because the Florida Constitution provides for such rights. *See* Dkt. 84, p. 45–46.

7. The press release stated that the Florida Constitution provides citizens "a private vote." *See* Dkt. 84, Exhibit 8.

As evidence of contemporary societal needs and structure, Plaintiffs rely upon the Task Force's conclusion that, in light of presently available technology which permits nearly every voter to vote without assistance, assisted voting should no longer be required.

■ Under "present facts and developing law" Plaintiffs' assert that the Court's Order fails to recognize the proposition that the construction of a statute by the administrator charged with its enforcement and interpretation is entitled to great weight. Plaintiffs cite as authority therefor *Department of Revenue v. Bank of America, N.A.,* 752 So.2d 637, 639 (Fla. 1st DCA 2000); *Department of Health & Rehabilitative Services v. A.S.,* 648 So.2d 128, 132 (Fla.1995); *Fiorentino v. Department of Administration, Division of Retirement,* 463 So.2d 338, 341 (Fla.App. 1st DCA 1985); and *State ex rel. Kurz v. Lee,* 121 Fla. 360, 163 So. 859, 863 (1935).

In *Bank of America,* automobile dealers assigned their interests in automobile installment sales contracts to a bank at the time of sale. The bank filed suit against the Department of Revenue, seeking refunds, pursuant to a Florida statute, for sales tax paid by dealers in connection with the automobile sales. The statute at issue allowed dealers to recover the sales tax paid at the time of the installment sale of the vehicle upon the vehicles return or repossession. The Department of Revenue asserted that only dealers are eligible to receive refunds or credits for the subject taxes. The record included a bulletin issued by the then Director of the Department of Revenue a month after the statute became effective; said bulletin provided that the statute restricted the right to a refund to the dealer who made the original sale. The record also included various memoranda from the agency, "in which the authors of the memoranda recognized the strength of the [b]ank's claim." Id. at 642.

Since the enactment of the statute at issue, the agency had only permitted tax refunds to dealers. The trial court granted summary judgment for the bank and stated that agency deference was not required because the agency did not have a "longstanding and consistent" position regarding the assignability of the right to the tax refunds. *Id.* at 640.

On appeal, the First District Court of Appeal stated that "an agency's construction of a statute is entitled to great weight and will not be overturned unless clearly erroneous." *Id.* at 641–42. The court held that only dealers are entitled to tax refunds, reasoning that the statute "expressly directs that only *dealers who retain a security interest* in the installment contracts are entitled to a refund of the uncollected portion of sales tax paid at the time of the sale" and that the trial court did not give appropriate deference to the manner in which the agency applied the statute since its enactment. *Id.* at 644 (emphasis in original).

In *Bank of America,* the Department of Revenue's construction of the statute, to which the court deferred, was expressed via official agency action-i.e., twenty-three years of consistently applying the statute such that only dealers were permitted to receive tax refunds. *See id.* at 644. Similarly, in the other cases cited by Plaintiffs, the respective agency's statutory or constitutional construction referenced by the courts was expressed via official agency action. *See A.S.,* 648 So.2d at 130 (on an appeal from a final agency order refusing to remove a person's name from an abuse registry upon request, the court considered the agency's construction of a statute as expressed in the agency's order); *Ft. Pierce Utils. Auth. v. Fla. Pub. Serv. Comm'n,* 388 So.2d 1031, 1033 (Fla.1980) (upon review of an agency's order concluding that the agency could not properly

consider the merger of two companies as part of its consideration of a third company's application to issue securities, the court deferred to the agency's construction of a statute as expressed in the agency's order); *Lee* 163 So. at 871 (referring to the consistently adhered to construction of constitutional provisions by all departments of state government that, except to the extent modified by a subsequent constitutional amendment, direct appropriations by the legislature for county purposes are prohibited); *Fiorentino,* 463 So.2d at 341 (on appeal from a final agency order holding that, upon withdrawal of funds from a retirement system, one's membership in the retirement system ceases and that part time employment does not allow one to qualify for participation in the retirement system, the court deferred to the agency's long-standing interpretation of the statute at issue); and *ABC Liquors, Inc. (Store No. 126) v. Dep't of Bus. Regulation, Div. of Alcoholic Beverages and Tobacco,* 397 So.2d 696, 696–97 (Fla. 1st DCA 1981) (on appeal from an agency order holding that the appellant was subject to extra tax, the court deferred to the agency's interpretation of a statute).

In the instant case, most of the evidence Plaintiffs rely upon cannot be considered expressions of the Florida Department of State. Plaintiffs rely upon statements of individual members of the Task Force which are not the Department's construction of Article VI, Section 1 of the Florida Constitution. Even the Task Force's conclusions cannot be considered as an expression of the Department's construction of Article VI, Section 1. The Task Force was convened to, *inter alia,* ascertain the obstacles persons with disabilities faced to voting in Florida elections. *See* Dkt. 83, Exhibit 12, p. ii. Thus, the Task Force was convened primarily for the purpose of gathering information and providing recommendations. *See id.* at Exhibit 12, p. i-ii.

Plaintiffs also rely upon statements made by Harris during a press conference and as quoted in an online newspaper. While Harris appears to have been speaking in her official capacity as Secretary of State, the court has found no cases where a court gave great weight to an administrator's public comments. Such statements are not akin to an official opinion letter, formal rule, or order, and thus, Harris' comments do not constitute evidence of a convincing nature that demonstrates to the Court a reason to reverse its prior decision. In addition, there is no evidence of a history of consistent agency application of Article VI, Section 1 in a manner consistent with Harris' public comments. Thus, Harris' public comments are not entitled to great weight.

Under the rubric "evils sought to be prevented," Plaintiffs rely upon evidence that they assert illustrates that the assistance provided to disabled voters under Section 101.051, Florida Statutes, fails to adequately protect one's vote from others' influence. Specifically, Plaintiffs rely upon the testimony of Assistant State Attorney Kracht, given before the Task Force, that, when he used the assistance provided under Section 101.051 to vote in the November 2000, election, the witness he was entitled to failed to remain in the voting booth while he voted. In addition, Kracht stated that upon requesting a witness, a poll worker shouted across a crowded room that Kracht did not trust him and wanted a witness. Kracht also recounted a colleague's experience, in which his colleague was initially prohibited from using his own sighted assistant as permitted by Section 101.051. Finally, Kracht stated that, in light of his conversations with other visually impaired voters, his and his colleague's experiences were not uncommon.

While Kracht's statements may indicate a deficiency in training and/or supervision, they are not sufficient to indicate that Article VI, Section 1 is not satisfied by the assistance provided by Section 101.051 or to warrant the Court's reconsideration of its previous Order.

 Finally, with respect to the "contemporary societal needs" factor, Plaintiffs assert that, in order to properly interpret Article VI, Section 1 in the framework of contemporary societal needs and structure, the Court must interpret the provision in the "contemporary framework of modern technology." Dkt. 46, p. 12. Thus, Plaintiffs, relying upon the Task Force's conclusions, the declaration of the Georgia Secretary of State, and letters from three county commission chairmen to the Director of Elections, assert that the technology exists today to allow manually and visually impaired voters to vote without assistance and that, in light of such technology, Article VI, Section 1 should be interpreted with this technology in mind.

Under Florida law, a constitutional provision is to be construed "in the framework of contemporary societal needs and structure." *In re Advisory Opinion to Governor,* 276 So.2d at 29. Nevertheless, as noted in the Court's October 16, 2002, Order, the fundamental goal when interpreting a constitutional provision is to give effect to the intent of the framers and adopters of the provision. *State ex rel. Dade County v. Dickinson,* 230 So.2d 130, 135 (Fla.1969). In addition, "[a] Constitution is not to be made to mean one thing at one time and another at some subsequent time, when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable." *State ex rel. West v. Butler,* 70 Fla. 102, 69 So. 771,

780 (1915) (holding that Florida Constitutional provision did not allow for more than one circuit court judge per judicial circuit; reasoning in part that a legislative construction of the constitutional provision passed contemporaneously with the adoption of the constitutional provision supported this interpretation and that the constitution should not later be interpreted to have a different meaning even if such new meaning was desirable at the time).

Implicit in Plaintiffs' argument—that "[w]hat sufficed as 'direct and secret' years ago is insufficient in the contemporary framework of modern technology," Dkt. 46, p. 12—is the idea that the framers and adopters intended Article VI, Section 1 to provide for unassisted voting to the extent possible at any particular time. Plaintiffs have cited to no evidence—and the Court has not found any—indicating that such was the framers' and/or the adopters' intent. In addition, the Court did not so interpret the provision, relying, in part, upon over thirty-years of tacit legislative interpretation of the provision as being satisfied by the assistance provided in Section 101.051.[8] While during a significant part of that thirty-year period technology that would allow disabled voters to vote without assistance was likely not available, it is not clear that such technology was not available in 1995 or 1999, the last two times that the Florida Legislature amended Section 101.051.

Perhaps the most compelling evidence that the Florida Legislature has tacitly interpreted Article VI, Section 1 to permit the assistance provided by Section 101.051 is the fact that the Legislature passed Section 101.56062. The passage of this Section provided the Legislature with an-

---

**8.** As noted in the Court's October 16, 2002, Order, if a constitutional provision could have more than one meaning and the Legislature has adopted one meaning by enacting a stat-

ute, the Legislature's interpretation is persuasive, if not controlling. *See Greater Loretta Imp. Ass'n v. State ex rel. Boone,* 234 So.2d 665, 669 (Fla.1970).

other opportunity to address the issue of assisted voting. Further, this Section appears to address at least some of the Plaintiffs' concerns about the ability of disabled voters to vote without assistance. The bill culminating in the passage of said legislation was sponsored by the Task Force's co-chairmen after the completion of the Task Force's work. Despite the Task Force's apparent conclusion that Article VI, Section 1 provides for unassisted voting, Section 101.56062 does not take effect until "one year after the legislature adopts the general appropriations act specifically appropriating" money to fund its requirements, 2002 Fla. Sess. Laws Serv. ch.2002–281, § 22. Neither party has indicated that there has been an appropriation funding the requirements of this legislation. Moreover, the Court's own inquiry to the Office of the Senate Appropriations Committee has confirmed the absence of such an appropriation in either the 2002 or the 2003 Legislative Sessions. Thus, it appears that the Legislature has not construed Article VI, Section 1 to require unassisted voting, because if the Legislature understood Article VI, Section 1 as mandating unassisted voting, surely the Legislature would have provided for Section 101.56062 to take effect immediately rather than it being contingent upon the vagaries of future funding. Given that conclusion, it appears that, in passing Section 101.56062, the Legislature has passed a law providing for rights greater than that which is guaranteed by the Florida Constitution, such law to become effective one year after the Legislature funds the initiative.

Upon consideration of the foregoing, it is hereby **ORDERED** that Plaintiffs' Motion for Reconsideration (Dkt.46) is **DENIED.**